## PEERY v. PEERY.

### (*Nashville.*    January 21,    1895.)

1. EVIDENCE. ·- *Testator's declarations.*

   Testator's statement, made some weeks before his death, and six
   months after the execution of his will, that he had to make the
   will as he did to have peace at home, is admissible to show
   his mental condition at the time of its execution, but not to
   show undue influence.    (*Post, pp. 330, 331.*)

   Cases cited: Beadles *v.* Alexander, 9 Bax., 604; Linch *v.* Linch,
   1 Lea, 526; Maxwell *v.* Hill, 89 Tenn., 584; 31 Am. St. Rep.,
   690; 9 Am. Dec.. 632.

2. SAME.    *Same.*

   Testator's statement, made six months after the execution of his
   will, that he had to make the will as he did to have peace at
   home, is not competent upon the issue of undue influence, in
   the absence of some other evidence thereof, and then it is ad-
   missible only to show the effect, not the substantive fact, of such
   influence.    (*Post, pp. 342, 343.*)

   Case cited: 31 Am. St. Rep., 690.

3. SAME.    *Same.*

   In the contest of a will on the ground of undue influence, evi-
   dence that sometime after its execution the testator spoke of
   its provisions to a subscribing witness, and expressed satisfac-
   tion and explained the apparently unequal division of his
   property, and thereafter permitted the will to stand, with the
   fullest opportunity to destroy it or make another, is a strong
   and convincing indication that it was his will and according to
   his desires.    (*Post, p. 343.*)

   Cases cited: 49 Am. Dec., 626; 11 Am. Dec., 648.

4. SAME.    *Competent upon one of several issues.*

   Evidence admissible upon one issue in a case, but incompetent as
   to others, cannot be excluded upon objection.    Nor can the
   Court be put in error by failing in his charge to limit the effect
   of such evidence to any particular issue, in the absence of a
   special request on that point.    (*Post, pp. 330–332.*)

Peery *v.* Peery.

5. WILL.  *Verdict of jury setting aside.*

The verdict of a jury in cases of contested wills has the same force and effect as in other civil cases.  The Court finds no evidence in this case to sustain verdict setting will aside. (*Post, pp. 332–338.*)

6. WILLS.  *Undue influence defined.*

Upon contest of w.ll for undue influence, the question is "whether the will is the will of the testator, or that of another."  It is not influence that vitiates, but undue influence; and it must go to the extent of depriving the testator of his free agency, and amount to moral coercion which he is unable to resist.   Each case must rest upon its own circumstances, and be controlled, to some extent, by the mental characteristics, and the mental and physical condition, of the testator, and, in a subordinate degree, by the mental strength and will power of the dominating influence, as well as the opportunities for its exercise.  (*Post, p. 338.*)

Cases cited and approved: McClure *v.* McClure, 86 Tenn., 176; Nailing *v.* Nailing, 2 Sneed, 630; Wisener *v.* Maupin, 2 Bax., 364.

7. SAME.  *Exercise of undue influence by wife.*

The legitimate exercise by the wife of that influence which results from love and affection in shaping the provisions of her husband's will in favor of herself and children does not vitiate the will.   Undue influence by the wife cannot be presumed from the fact that she had opportunities and temptations to exert it, but must be affirmatively shown.   She has the right to advise with and counsel her husband to make such will as she deems just and proper, and for this purpose may use legitimate argument, entreaty, and importunity.  (*Post, pp. 338–340.*)

Cases cited and approved: Nailing *v.* Nailing, 2 Sneed, 630; Smith *v.* Harrison, 2 Heis., 230; Simerly *v.* Hurley, 9 Lea, 711; 31 Am. St. Rep., 679.

---

FROM HICKMAN.

---

Appeal from Circuit Court of Hickman County. W. L. GRIGSBY, J.

---

Peery *v.* Peery.

---

VERTREES & VERTREES, W. P. CLARK, R. L. PEERY, and H. M. McADOO for Appellants.

PITTS & MEEKS and T. L. LANIER for Appellees.

WILKES, J. This is a contest of the will of Marcenus G. Peery, upon an issue of *devisavit vel non.* The issues tendered in the Circuit Court were, first, that the paper writing was not the last will of M. G. Peery, and, second, that it was not such will, because it was procured to be executed by improper means and undue influence. The cause was tried before the Court and a jury, and a verdict and judgment rendered against the validity of the will, and proponents have appealed and assigned errors.

It is assigned as error that the Court admitted certain declarations made by the testator to his son, M. B. Peery, some weeks before his death, and about six months after the will was made. The substance of this declaration made by the father is, that he had to make the will as he did in order to have peace at home. This evidence was excepted to as hearsay, and because it could not be introduced to impeach the will as made, and the objections were overruled.

It has been held that the testator's declarations, after making the will, are admissible to show his mental condition at the time the will was made, but not to show undue influence. If, therefore, the

Peery *v.* Peery.

latter had been the only issue tendered by the pleadings in this case, the evidence would have been incompetent and inadmissible. But inasmuch as under the pleadings, the general issue of will or no will was tendered, it was admissible to introduce evidence to show the testator's mental condition at the time the will was made, and evidence was introduced to show that the testator's mind had become enfeebled by disease.

The proponents were entitled, on request, to have this testimony limited by the Court to the point of the testator's mental condition at the time the will was made, and to have the jury instructed that they must look to it for that purpose alone; but, in the absence of any request to so limit it, the objection was too broad, and the Court was not in error in refusing to exclude the declarations, and in failing to limit them. It is true the main contest in this case is over the question of undue influence, and it was so treated by counsel and Court, still, the issue of mental infirmity was tendered in the pleadings, and to some extent supported by evidence, and it cannot be overlooked or ignored.

Upon the general question of admitting such declarations, see Pritchard on Wills, Sec. 147, and cases cited; *Beadles* v. *Alexander*, 9 Bax., 604, 606; *Linch* v. *Linch*, 1 Lea, 526; *Maxwell* v. *Hill*, 5 Pickle, 584, 594, 595. See also, *In re Hess' Will*, 31 Am. State Rep., note, page 690. In *Beadles* v. *Alexander*, 9 Bax., 604, the declarations

were admitted to show that the testator signed the will. In *Reel* v. *Reel*, 9 Am. Dec., 632, to show whether the testator knew the contents of the will. In *Maxwell* v. *Hill*, 5 Pickle, 595, to show whether the testatrix fully comprehended and approved the will as written. *Linch* v. *Linch*, 1 Lea, 526, simply approves the case of *Beadles* v. *Alexander*, 9 Bax. None of these cases are authority for the proposition that subsequent declarations are admissible where the only issue is that of undue influence.

Other errors are assigned which we need not consider in detail in the view which we have taken of the case. The first and most material assignment is, that there is no proper and sufficient evidence to support the verdict.

The rule laid down as to the force and effect of a jury's verdict is not different in cases of contested wills from that laid down in other cases, and we proceed to examine the facts as tested by the usual rule.

The testator died in 1888, being about seventy-four years of age. He had been twice married. By his first wife he had four sons, who are the contestants of the will. By his second wife he had three sons, one of whom died, and the other two, with his widow, are the chief beneficiaries under the will. His second wife had also two children by her first marriage, before she married the testator. There were thus three sets of children, two of them the children of the testator, and the other set, the

children of his second wife by a former husband. The testator lived happily with his last wife twenty-eight years, but the several sets of children did not agree. The consequence was that the husband's children by his first wife and the wife's children by her first husband, left the roof tree, and only the last set of children remained with their parents. This arrangement seems to have caused no disagreement between the husband and wife. The testator is shown to have been a quiet, honest, just man, of excellent character, and more than ordinary education; a man of firm and decided views and opinions. Mrs. Peery was a woman of strong will and quick temper, and, for a part of her married life, was in bad health and nervous, but had recovered before the will was executed. There is no direct evidence of any disagreement between the husband and wife during the whole of their married life. The testator owned a home place, worth from five to six hundred dollars, a one seventh interest in a body of timber lands, containing some 10,000 acres, worth, perhaps, one dollar per acre, and about $900 in good cash notes. By his will, he gave the home place to his wife for life, and the remainder to his last set of children, charging them with $400 in favor of his first children. He gave also to his first children the one seventh interest in the timbered land, and divided equally all his other property between all his children, giving nothing to his wife's children by the first marriage. The will was

executed March 8, 1888, and the testator died in September, 1888, about six months thereafter.

It is not insisted that the testator did not have mental capacity sufficient to . make a will, but there is proof that for some years his health had been precarious from a heart trouble, and that his mind was not as active or vigorous as it had been formerly. There is no evidence that the last set of children had anything to do with making the will or causing it to be made. The contention is wholly that the undue influence was exercised by the wife in favor of this last set of children. It is not insisted that she attempted to get anything for her own first set of children, and there is no evidence tending in that direction, except the testimony of a single witness. A summary of the testimony is as follows :

Mr. McLanahan testified that about twenty-five years ago he had a conversation with the testator, in which he stated that he thought as much of one of his children as of another, and was going to treat them all alike.

M. B. Peery, one of the first set of children and the principal contestant, states that he repeatedly heard Mrs. Peery say she intended to see that the older children got nothing off the place, and that she intended .to see that her husband made a will and cut the older children out. This was some twelve or fifteen years before the will was made.

In 1878 or 1879, J. D. Aydelotte, heard Mrs.

Peery say she thought the children of the last marriage ought to have the property, as they had remained with and worked for the old folks, while the first set had gone off and worked for themselves, but he did not hear her say anything about a will.

About the year 1884, Ras Hill heard Mr. Peery say that his wife had been after him to make a will and give her children by her first husband a share with the others, and he had promised her to do so, but that he did not intend to make a will if he died in his right mind, but intended to treat all his children alike.

Mrs. Mary Hutchison testified that Mrs. Peery told her that she was going to see that the property was willed to the younger children, as the older ones were off, working for themselves.

Mrs. Burchard testified that she heard Mrs. Peery say it looked to her like the younger children ought to have the property, as they had stayed at home, while the older children had gone off, working for themselves.

Mrs. Cave Peery says that, about twenty-three years ago, she heard Mrs. Peery say that she intended to see to it that Mr. Peery made a will.

Frank Nunn testifies that, about 1870, Mr. Peery, at his wife's request, stopped a plow that she might have a horse to make a visit. She was then in bad health. He heard her say that she intended to have him make a will, and leave the children of the first marriage out.

Mrs. Lindsley lived with Mr. Peery about 1882, and heard Mrs. Peery say she thought the land ought to be willed to the younger children.

J. S. Prince states that he heard the testator say he did not intend to make a will; that the law made a good enough will, and he intended to treat his children all alike. This was some one to three years before his death.

Mrs. Gracey Whiteside testified that, a short time before the will was made, she heard Mrs. Peery say she thought her husband ought to made a will and give the home place to the younger children, because they had stayed at home and worked, while the others had gone off.

M. B. Peery, one of the first set of children, testifies that, in 1888, after the will was made, he asked his father why he had made such a will as he had made, and his father replied that Mrs. Peery had been after him for years to make a will, and that he had to make it as he did to have peace at home.

The will was written by J. H. Peery, a young attorney, who was the kinsman of the testator. The testator personally went after him to his father's home, to get him to write the will, and told him how he wanted it written, and discussed with him his pecuniary condition. The attorney went to the testator's home, March 7, 1888, to write the will, and remained there all night, and the will was written that night. Mrs. Peery, the wife, was in the

room, lying on the bed.    After  the  will  was  writ-
ten,  the  testator  suggested  the  insertion  of  some
words that had been inadvertently left out, and they
were  inserted  at  his  suggestion.    He  read  the  will
over  the  next  morning,  and  said  it  was  all  right.
The  attorney  then  copied  or  redrafted  it,  so  as  to
have  a  clean  copy.    Neighbors  were  sent  for  to  wit-
ness  it,  which  they  did  at  the  testator's  direct  re-
quest.    It  is  shown  that  the  testator  dictated  the
will,  and  stated  to  the  witnesses  that  it  was  his  will,
and  he  had  read  it  over  carefully,  and  that  it  was
just  as  he  wanted  it,  and  asked  them  to  witness  it
as  his  will,  and,  when  it  was  executed,  no  one  was
present  but  the  testator  and  the  witnesses.    A  few
weeks  afterward,  while  riding  home  from  Centreville
with  Mr.  Hill,  one  of  the  subscribing  witnesses,  he
brought  up  the  subject  of  the  will,  and  told  Mr.  Hill
of  its  contents,  and  expressed  satisfaction  with  its
provisions,  and  said  that  the  older  boys  had  left  him
when  young,  and  all  had  homes  but  M.  B.  Peery,
called  "Bas;"  he  could  have  had  one  if  he  had
tried  or  wanted  one.    He  also  stated  that  he  intended
to  go  to  Kentucky,  and  give  his  children  there  some
money,  meaning  his  first  set  of  children.    There  is
evidence  also  that  the  will  is  similar  to  that  made  by
the  testator's  father,  who  was  somewhat  similarly  sit-
uated.    There  is  evidence  of  a  general  character  show-
ing  that  Mrs.  Peery  dominated  and  controlled  her
household  affairs  and  other  matters  in  which  she  was
interested,  but  none  that  she  coerced  or  compelled

22—10 P

her husband to do anything he did not desire to do, or that she influenced him, except by her influence and love.

This is substantially all the evidence in the case upon which the jury found against the will, and the question is, Is there any evidence of the kind and character required to set aside a will in this record? It has been said that it is impossible to define what it takes to constitute undue influence in any such general language as would be applicable to all cases, but it has been well said that the question, reduced to its last analysis, is "whether the will is the will of the testator or that of another." *McClure* v. *McClure*, 2 Pickle, 176; Pritchard on Wills, Sec. 128. It is not influence that vitiates, but undue influence; and it must go to the extent of depriving the testator of his free agency, and amount to moral coercion which he is unable to resist. *Nailing* v. *Nailing*, 2 Sneed, 630; *Wisener* v. *Maupin*, 2 Bax., 364. Each case must rest upon its own circumstances, and be controlled, to some extent, by the mental characteristics, and the mental and physical condition, of the testator, and, in a subordinate degree, by the mental strength and will power of the dominating influence, as well as the opportunities for its exercise. *McClure* v. *McClure*, 2 Pickle, 176. When the charge is that such undue influence is exercised by the wife, other considerations also enter into the matter. It cannot be presumed, because the wife has ample opportu-

nity and inducement to exert such influence, that she has done so, but it must be shown that she has exerted such influence for an improper purpose. The fact that a wife has a great influence over her husband in the ordinary affairs of life, and exercised control over his home and domestic concerns, raises no presumption against her in the matter of his will. All of these things are perfectly consistent with wifely duty and privilege, and the legitimate result of that influence which love and affection should exert. *McClure* v. *McClure*, 2 Pickle, 173; *Small* v. *Small*, 16 Am. Dec., 253. As a general proposition, a father has a legal right to make his will as he chooses, even though it may seem to his children to be unjust and inequitable; and a wife has a right to advise with and counsel her husband to make such a will as she deems just and proper, and neither the Courts nor juries have any right to disturb such wills if they are freely made by the testator. And this is so even though the wife uses legitimate argument, entreaty, and importunity in order to shape its provisions in favor of herself or children. *Hughes* v. *Murtha*, 32 N. J. Eq., 288; *Nailing* v. *Nailing*, 2 Sneed, 63; *Smith* v. *Harrison*, 2 Heis., 230, 247, 250; *Simerly* v. *Hurley*, 9 Lea, 711. We know of no rule of law or morals that makes it unlawful or improper for a wife to use her influence for her own benefit or for the benefit of others, unless she acts fraudulently, or extorts benefits from her husband

where he is not in a condition to exercise his faculties as a free agent. Every faithful wife has, and ought to have, a very great influence over her husband, and it would be monstrous to deny her the right to express a wish about the disposition of property which, in a majority of cases, she assists in creating and preserving. See cases in 31 Am. State Repts., 679; *In re Hess' Will* and notes. It is true undue influence may be proven by circumstantial evidence, but still it must go to the extent of showing that the testator was dominated beyond his control and deprived of his free agency. It is also true that a wife has ample opportunities to exert her influence secretly upon her husband, but it cannot be presumed, in the absence of any proof, that it was unduly exercised to constrain him to do that which he otherwise would not do. It should be borne in mind also that a testator, when he lives for any length of time after making his will, has ample opportunity to change his will, if he so desire, or make another, and this without the knowledge of the wife or other interested party.

There is a discrimination in this will in favor of the younger children, but is explained upon grounds not unreasonable, and there is no such inequality in the distribution of the estate as to shock the conscience of the Court or to raise a presumption against the will upon its face. The evidence is ample, and it is conceded, the testator had mental capacity to make a will, though his health and

vigor of mind had been, to some extent, impaired by disease. Outside of the declaration made to "Bas" (M. B. Peery) by the testator, we are unable to find any evidence in this record directly connecting Mrs. Peery with the making of this will in any way whatever. Although many of the witnesses lived with Mr. and Mrs. Peery for many years, and were intimately acquainted with them, not one of them testifies to any conversation between the husband and wife in regard to a will, and, so far as this record goes, no such conversation ever occurred. It is hardly possible that the wife could have kept up her importunities for twenty years or more, as counsel contend, and yet no one be able to tell of a single conversation with her husband. It is not proven that she was instrumental in getting a draftsman for the will, or that she ever spoke to him about the will, unless, perhaps, on one occasion she inquired when he could attend to that business. That she was in the room when the will was written is shown; but it is not shown that she said or did anything, and she was not present when it was signed and witnessed.

While the will shows a preference for the younger children, the reason for it is given, and appears to be not only natural, but reasonable. If the wife had such controlling influence over her husband as to completely dominate his will, and deprive him of his free agency (and the evidence must go to that extent to be effective), it is strange she did not

compel some· provision for her own children, the
most natural thing to do under ·such circumstances.
The evidence consists wholly of declarations of the
wife as to what she desired and intended to have
done. In some cases the declarations were that she
wanted a will which would leave out the older
children, and intended it should be so made. In
other cases,· that she thought a will ought to be
made; and, again, that she thought a will ought to
be made to give the home place to the younger
children, because they had remained and worked for
them, while the others had gone away as soon as·
they could to work for themselves. All of these
declarations were made from twelve to twenty-five
years before the will was made, except· one or two,
and these of no very definite character. No im-
portunity or threat or act on her part towards her
husband is shown. No conversation is proven be-
tween them, no altercation, no irritation or estrange-
ment. The only testimony showing that the testator
ever had any conversation with his wife about a
will is his statement to Hill that his wife wanted
him to give her children a share, which he did not
do, and which, it seems, was never repeated, and
his statement to contestant, M. B. Peery, that he
had to make the will as he did in order· to have
peace at home.

The declaration made to M. B. Peery by· the
testator is not sufficient to prove the fact of undue
influence. Undue influence cannot be supported alone

by the subsequent declarations of the testator. If there be other evidence of undue influence, then such declaration could be looked to to determine the effect which such influence had upon the testator, but not to prove the substantive fact of undue influence. *In re Hess' Will*, 31 Am. State Repts., 690, note, and cases there collated.

It is shown that the testator, some time after making his will, spoke of its provisions to one of the subscribing witnesses, and expressed satisfaction with its contents, and explained why he made an apparently unequal division of his property. He had then had ample time and opportunity to have revoked it, as it was in the custody of the draftsman, and not of his wife; or he could have easily have had another written. This is a strong, convincing indication that it was his will, and according to his desires. *Floyd* v. *Floyd*, 49 Am. Dec., 626; *Irish* v. *Smith*, 11 Am. Dec., 648.

In all cases where undue influence is attempted to be proven, the case must turn, not upon the number of witnesses examined, but the character and force of their testimony, and the inquiry is, Does the testimony go to the extent of showing the exercise of such undue influence and dominion by the wife over the husband as deprived him of his free agency in making his will, and made it her will instead of his? If it fail to come up to this point, it matters not how great the number of witnesses, or how large the volume of testimony, there is no

proper or legal evidence upon which to set aside the will. We find no evidence of this character in this record, and the cause is reversed and remanded for a new trial.

Contestants will pay the costs of appeal.