HAGER v. HAGER et al.—66 S. W. (2d) 250.

Middle Section.   March 11, 1933:

Petition for Certiorari denied by Supreme Court, December 15, 1933.

George M. Thomas, of Nashville, and J. D. Hankins, of Hartsville, for plaintiff in error.

Pitts, McConnico & Hatcher and Walker & Hooker, all of Nashville, for defendants in error.

DeWITT, J.  This cause is before this court upon a second appeal in error from a verdict and judgment against the validity of a codicil to the will of J. L. Mosley, deceased.  The record is very large, and in behalf of the plaintiff in error, the proponent Jean Hager, executor, eighty-four assignments of error have been filed and are here insisted upon.

Upon the former appeal in error from a like verdict and judgment the judgment was reversed and the cause was remanded for another trial.  The opinion of this court is reported in 13 Tenn. App., 23-39.

The prior will of the testator was executed in Texas on December 27, 1918.  In that will he gave all of his property to his wife, Mrs. Mary Elizabeth Mosley.  They had no children.

Mrs. Mosley died two days before August 25, 1928, on which day Mr. Mosley signed in the presence of three witnesses the codicil, which is as follows:

"I, J. L. Mosley do hereby make the following codicil to my foregoing will, dated December 27, 1918, owing to the fact that my wife has recently died.  I hereby designate my wife's son, Jean Hager to take her place in said will, hereby devising and bequeathing to said Jean Hager all of my estate both real and personal, and I appoint him executor of my will without bond.  I do this because he has been kind and affectionate and has nursed me and his mother in our illness when my own nearest relatives neglected me."

Mrs. Mosley left surviving her, as the issue of a former husband, a son by the name of Jean Hager, and two grandchildren, J. G. Hager and Carl Hager, the issue of a deceased son.

It is conceded that if the original will stands without modification, the estate goes one-half to Jean Hager and the other half to J. G. and Carl Hager.

The attack upon the codicil was for alleged fraud and undue influence of Jean Hager practiced upon the testator, and for alleged lack of mental capacity in the testator at the time of the execution of the codicil.

Upon the second trial, issues submitted to the jury, and the jury's verdict thereon, signed by every member of the jury, were as follows:

"(1)  Was the testator J. L. Mosley of sound mind and disposing memory at the time he executed the codicil to his will, to-wit August 25, 1928?  (Answer 'yes or no.')

"Answer:  No.

"(2)  Did the proponent, Jean Hager, practice fraud upon the testator or exert undue influence over him upon the very act of making said codicil?  (Answer 'yes' or 'no'.)

"Answer: Yes.

"(3)   We find against the codicil."

There is no assignment that there is no evidence to support the verdict of the jury.   Under an assignment going only to the weight or preponderance of the evidence, which this court cannot consider, it is argued that there is no credible evidence to the contrary of the insistence that the preponderance of the evidence is against the findings of the jury.   Such a preponderance is insufficient, for the weight and credibility of the evidence is a matter for the jury alone to determine.   This rule is so thoroughly settled by a long line of cases that no citation of authority is necessary to support it.   Upon the conclusion of the evidence offered by the contestants, a motion for a directed verdict in favor of the validity of the codicil was made in behalf of the proponent and was overruled.   This motion was not renewed at the close of all the evidence, and therefore it must be treated as waived.   The rule is well settled that if the plaintiff fails to make out his case and the court refuses a motion for peremptory instructions he is in error, but if the defendant afterwards introduces evidence he thereby waived the motion which he made for a directed verdict at the close of the plaintiff's evidence.   In testing this question in this case the contestants must be treated as in the same situation as plaintiffs, for the burden was upon them to make out their case for setting aside the codicil after the formal execution of the codicil had been shown.   Rhoton v. Burton, 2 Tenn. App., 164-167, and cases cited.

There is abundant competent, substantial evidence upon which, considered alone, the jury could predicate, in answer to the first issue, its finding that the testator was not of sound mind and disposing memory when he executed the codicil.   As the verdict is not a general verdict, we are not left to conjecture whether or not the verdict was unfavorable to the codicil upon either issue.   This finding, based upon substantial competent evidence, would be sufficient to invalidate the codicil, provided that no errors were committed upon the trial which manifestly affected the verdict of the jury.   Code, sec. 10654.

There was much material evidence that the testator, Mr. Mosley, was an old man who had suffered a hemorrhage of the brain, with his left side involved, was rendered unable to talk clearly, and confused in mind.   This occurred about the middle of May, 1928, or about three months prior to the execution of this codicil.   He was confined to his bed for three or four weeks, never recovered, and died from the effects of the stroke in September, 1928.   His physician, Dr. Huffman, attended him constantly.   He testified that during the months of June, July and August, 1928, he was in a state of senility, declining mentally and physically.   Sometimes he would not recognize the physician.   Dr. Huffman testified that he "should not think" that Mr. Mosley was of sound mind in August, 1928.   During this

time following the stroke Jean Hager attended Mr. Mosley constantly.

Dr. Huffman was asked on redirect examination if there was any doubt in his mind about Mr. Mosley being of unsound mind. He answered, "If I were asked my own opinion about his mental condition, I do not think he was sound." The only objection made was that this was repetition, as witness had already been examined on this question on his direct examination. It will be remembered that his first answer was not as clear and positive on this subject as was this answer. He was an expert witness. He described carefully the physical condition of the testator and stated that he predicated his opinion on the fact that Mr. Mosley had had a stroke, a long profound senility, drifting out and not himself at times, and a fixed stare in his eyes, drooling of saliva. He had been cross-examined at much length, on the subject of the mental and physical condition of the testator. It was certainly not improper to ask again the question on redirect examination. It only tended to develop more clearly the opinion of the witness and the basis of it after the cross-examination. And the matter of allowing the question to be asked and answered on redirect examination was a matter within the discretion of the trial judge. The discretion was not abused.

Certain lay witnesses also testified, from facts given from their observation, that in their opinion Mr. Mosley was of unsound mind.

It is well settled that admissions made by the sole beneficiary under a will may be proved as competent evidence against him upon such issues as those pending in this cause, Schouler on Wills, sec. 244, 40 Cyc., 1163, 1289; 14 Encyl. of Ev., 256, and cases cited; 28 R. C. L., 401. Under this rule certain declarations, made by Jean Hager prior to the execution of the codicil as to the condition of mind and will of Mr. Mosley, were competent to be proved by witnesses. The witness J. K. Hager testified that just prior to the funeral of Mrs. Mosley, Jean Hager stated that Mr. Mosley had no more mind than a child.

The witness E. G. Calhoun testified that he tried to console Mr. Mosley in his weakness and Jean Hager said to him that Mr. Mosley did not understand anything that he said. He also said that Jean Hager told him that Mr. Mosley was just like a child; he did not realize what the witness was saying to him:

The witness Marvin Bugg testified that Jean Hager said to him that Mr. Mosley was just like a baby, just like a child; that he could not do anything for himself; that he had to wait on him.

All of this testimony was competent as showing admissions against interest made by Jean Hager as bearing upon the issues of fraud and undue influence and mental unsoundness. It is not necessary to elaborate upon this, for it is evident that if the jury believed that Jean Hager made such admissions, they would have a right to infer

150

that he brought about the execution of the codicil by fraudulent methods and undue influence which would be fraudulent under such circumstances, knowing that the testator did not have mental capacity to execute a testamentary paper.

■ Dr. Huffman was asked if anybody advised him concerning the taking of Mr. Mosley from Lebanon on the morning of August 25, 1928, the day after the burial of his wife, and bringing him to Nashville. He said that nobody advised him concerning it. He was also asked if Jean Hager or any one else consulted him about it and he said no. He was asked when he first found out that Mr. Mosley had been taken to Nashville. He said that he went down to inquire about the condition of Mr. Mosley the morning after Mrs. Mosley was buried, and he was told that they had gone to Nashville. All of this testimony was competent as bearing upon the motives of Jean Hager and the extent of control which he had over the testator. The fact that an old man who had just lost his wife and was paralyzed and was suddenly taken to Nashville, without consulting his physician, for the purpose of executing a codicil to his will, was a material circumstance bearing upon the issues of fraud and undue influence.

■■ The witness A. B. Parks testified that on one occasion he talked with Jean Hager about renting a house; and that Hager told him that he would have to get back upstairs, that Mr. Mosley was just like a child, he was liable to get into mischief, that he would have to look after him all the time. Counsel then asked the witness a question as follows:

"Now, he said he would have to get back upstairs, that Mr. Mosley was just like a child, that he was liable to get into mischief, that he had to look after him all the time?"

The question was objected to as a repetition. This could not be considered as manifestly affecting the verdict. The testimony just given by the witness was competent as showing a statement or admission against interest by the proponent—tending to show a knowledge by him of a weak mental condition of the testator.

The question was again propounded to the witness with reference to the time when the conversation occurred—shortly after Mr. Mosley had executed the codicil and moved to Nashville. It was not improper thus to ask the question for the purpose of showing about when the conversation occurred.

In many assignments it is insisted that prejudicial errors were committed in the admission of evidence unfavorable to the character of Jean Hager. Upon this trial Jean Hager did not testify, but he was, of course, a party to the suit. Many times in the cross-examination of witnesses in his behalf as proponent of the codicil, and in the direct examination of witnesses for the contestants, questions and answers were permitted that reflected seriously upon the character of Jean Hager. In most instances these related to specific acts of

moral delinquency, violation of law, conviction and imprisonment for violation of the Harrison Narcotic Act (26 U. S. C. A., secs. 211, 691 et seq.), and other details of misconduct. These questions were not asked in the form of interrogatories as to general character or reputation, but directly and specifically to elicit facts that Jean Hager had been guilty of the acts definitely set forth in the questions.

It is the universal, general rule that when the character of a party to a civil action is not a relevant fact apart from any inference of conduct arising therefrom, it is not a proper subject of inquiry, for while it is recognized that ground for an inference of some logically probative force as to whether or not a person did a certain act may be furnished by the fact that his character is such as might reasonably be expected to predispose him toward or against such an act, this consideration is outweighed by the practical objections to opening the door to this class of evidence. 22 C. J., 470; 1 Wigmore on Evidence, sec. 64; 10 R. C. L., 947. An exception applies where the nature of the action involves the general character of the party, or goes directly to affect it—where damages claimed embrace injury to feelings, as in actions involving chastity, malicious prosecution, false imprisonment, or libel or slander. 22 C. J., 472; Spears v. International Insurance Company, 1 Baxt., 371. In the text of 40 Cyc., p. 1162, a rule is declared as follows:

"As circumstances tending in some slight degree to furnish ground for an inference of fraud or undue influence, it is proper to consider the character of the proponents and beneficiaries, any interest or motive on their part to influence unduly the testator, and facts and surroundings giving them an opportunity to exercise such an influence," citing cases.

A case directly in point is the Pennsylvania case of Nussear v. Arnold, 13 Serg. & R., 323. See, also, Schouler on Wills, sec. 242; Underhill on Wills, sec. 188.

While the bad character of the beneficiary may thus be considered, the weight to be given it must depend largely on the other facts which accompany it, and the circumstances of each particular case. It serves to intensify the care and diligence with which facts relating to the execution of the will should be examined. On the other hand, in Franklin v. Franklin, 90 Tenn., 44, 16 S. W., 557, it was held that upon the trial of an issue of devisavit vel non, it was not competent to show, in support of the charge that the proponent and legatee had forged the will, that he had committed other independent forgeries.

But whichever rule is applicable here, it was not competent to prove bad character of the party by such a line of direct questioning as to specific acts. Character or reputation of a party can be proved only by evidence of general reputation in the community and not by specific acts nor from the personal knowledge of

the witness. A party to a suit should always be prepared to defend his general character or reputation, but not to answer charges or particular acts unless they are the subject of the action. 10 R. C. L., 953; 22 C. J., 481. Even in an action in which the character of a party is directly involved, his general character or reputation only, not specific acts, may be shown in evidence. This rule applies in cross-examination, although in Tennessee such examination is limited only by the relevancy and competency of the evidence, the cross-examiner not being confined to the matters upon which the witness was examined in chief. Sands v. Railway, 108 Tenn., 1, 64 S. W., 478. A witness testifying as to general character or reputation may be cross-examined as to specific acts as a part of that general reputation. A witness may be cross-examined as to specific acts done by himself in order to test his credibility and the weight of his testimony. But such was not the character of the cross-examination here in question. We know of no rule permitting the cross-examination of a witness as to specific acts of a party to a civil action who is not a witness upon the trial, when the witness under cross-examination has not testified as to the general character or reputation of the party and the acts sought to be shown are other than those with which he is directly charged in the action.

In Bell v. Farnsworth, 11 Humph., 608, an action for slander, the defendant offered to prove that apart from the general trait of character in question (false swearing), the plaintiff was of general bad character; that he was dishonest, and a common barrator, etc. The court rejected the evidence. The Supreme Court held that it was properly rejected. The court then formulated the rules as follows:

"We take the rule to be this: That evidence of the plaintiff's general character, in regard to the particular trait involved in the matter charged against him, is admissible in mitigation of damages. The character of the party in other respects, is not to be considered as in issue. See 1 Greenl. Ev., secs. 54, 55, and cases there referred to. 2 Stark. on Sl., 88.

"Evidence of particular facts is also inadmissible; it must be of general reputation. It is to be presumed that the plaintiff in the present case was prepared to defend his general reputation for veracity, that being the trait involved in the issue; but not to defend or justify his general conduct through life, nor to defend against particular facts and charges not involved in the suit or matter between the parties."

In Lambert v. Pharis, 3 Head., 623, the court said:

"The plaintiff's general character, and that only, upon the trait involved in the charge, in this case false swearing, is put in issue, in actions of slander. . . . He is supposed to be always prepared to defend that, when he sues for character, but not all the special charges that may be brought against him, and not even his general

character upon traits not involved in the charge. Much less is he presumed to be ready to meet all that report and rumor may have thrown out against him."

The same rule was applied in Birchfield v. Russell, 3 Cold., 230, and Hackett v. Brown, 2 Heisk., 265.

■■ It was therefore error to allow questions to be asked and answered as to specific acts or matters in attack upon the character of Jean Hager. This extends to questions whether or not the testator knew of these things before he executed the codicil, for testimony tending to show that he had such knowledge tended also to bring out such facts before the jury. Assignments of error numbered 4, 5, 6, 10. 11, 12, 13, 14. 15, 16, 17, 18, 19, 20, 21 to 38, inclusive, 50, 51, 54, 55, 57, 58, 60, 61, 66, 69, and 70 are sustained.

However, the question remains whether or not these errors manifestly affected the verdict of the jury in response to the first issue, as to the mental capacity of the testator. The contention made is that is that the admission of these questions and answers caused the jury to reach its conclusion upon this issue from passion and prejudice.

At various times during the trial certain facts were nevertheless elicited in such form that they cannot here be the subject of challenge as to admissibility. The fact that Jean Hager was convicted in the Federal court of violation of the Harrison Narcotic Act and sent to the penitentiary at Atlanta where he served a term, and that he returned to Lebanon in May, 1928, was shown several times without objection; in fact, it was at least once referred to by his own counsel in asking a question of a witness. The contestant J. G. Hager was, without objection, asked and he answered as follows:

"Q. Did Mr. Mosley know that Mr. Hager was charged with taking off a typewriter out here at Old Hickory that didn't belong to him, and if he knew these facts state whether or not he was present in court when the matter was heard? A. Yes, sir."

■ Exception was taken to a question asked of Ex-Governor Roberts containing a reference to Hager having come out of the penitentiary, but no ruling thereon was made by the court. The objection must be considered as waived. Montgomery v. Coldwell, 14 Lea, 29.

■ The following questions and answers were admitted over objection:

(Witness was contestant J. G. Hager)

"Q. What did Mr. Mosley do or say in connection with the executor in this case mistreating his wife? A. Mr. Mosley told my father, says, 'Carl, come upstairs and see if there is anything you can do for Sydney,' says, 'Jean is just simply beating the life out of her.'"

This testimony was competent as to the mental attitude of the testator toward the beneficiary.

The witness Mrs. Martin was asked whether or not Jean Hager had made any statement to her why he had not testified when he had testified upon the former trial. Objection was made on the ground that it threw no light upon the issues; but no ruling upon the objection was made nor was any similar question asked of the witness.

The contestant Carl Hager was asked on cross-examination: "You spent a good deal of your time with the former husband of his wife, a man that had been divorced on account of cruel and inhuman treatment, didn't you?" Whereupon one of the counsel for the contestants said in the presence of the jury: "We concede that neither Jean Hager nor these boys are any blood relation to Mr. Mosley. It just happens that Dr. Hager, that they come here and try to paint as such a horrible man happens to be Mr. Jean Hager's father, but just the grandfather of these two boys. We submit there is no use going into detail about that in the presence of this jury, but we except to it."

The court said: "He says as to his knowledge, what he knows."

The assignment challenging these remarks of counsel cannot be considered, as no exception was taken to them at any time during the trial.

A witness named Ham was introduced by the proponent, and he testified that from conversations which he said that he had with Mr. Mosley he was of the opinion that he was of sound mind. Upon cross-examination he stated that Mr. Mosley was smooth-shaven, having no beard or moustache. As it had been shown and was conceded that he had a long, full beard, counsel for the proponent, evidently surprised and believing that the witness was unworthy of belief, withdrew his entire testimony; and upon their request the court instructed the jury not to consider his testimony. Nevertheless, in their arguments before the jury, two of the counsel for the contestants fiercely denounced the proponent Jean Hager as having fraudulently undertaken to introduce the said witness, with insinuations that he knew that his testimony would be false. They argued that a man who would do this would be guilty of procuring the execution of a will in his favor by fraud and undue influence. They also argued that Jean Hager's lawyers did not introduce him as a witness because they did not want to accredit his testimony as true, and this was to their credit.

It is the rule that what is proven by direct testimony or is fairly inferable from facts and circumstances proved, and which has a bearing upon the issues, may be fair subject for comment by counsel, and if such deductions or inferences tend to fix upon a party the guilt of which he is charged, it is within the scope of proper and fair argument to denounce him accordingly. To make vituperation and abuse grounds for reversing a judgment in any event, it must appear that the remarks indulged in were unwarranted and grossly improper, and

·that they were well calculated to affect injuriously the rights of the opposite party. 2 R. C. L., 427, and cases cited. A common instance of misconduct of counsel in argument to the jury is the unfounded denunciation of the adverse litigant in order to excite the resentment of the jury against him. L. R. A., 1918D, 87. But in the instant case the circumstances presented were sufficient for counsel to make deductions that could not be said to be unfounded. We do not say whether they were sound or unsound. The remarks of counsel complained of contained some denunciation and abuse, but they were leveled at what, if true, would be subornation of perjury. They related to an occurrence upon the trial and went to the honesty and good faith of the proponent in his defense of his cause. It is well settled that the latitude of argument is under the control of the court; that it must be left largely to the ethics of the profession and the discretion of the trial judge. Saunders v. Baxter, 6 Heisk., 381; Ferguson v. Moore, 98 Tenn., 342, 39 S. W., 341.

The rule is, also, that in a civil case counsel may comment on the failure of a party to testify in explanation of testimony against him where the circumstances are sufficient to justify comment. 38 Cyc., 1492. It is otherwise in criminal cases. Smithson v. State, 127 Tenn., 357, 155 S. W., 133.

Passion and prejudice will not be presumed to have influenced the minds of the jurors (4 C. J., 774), although it is presumed that the jury considered whatever evidence was laid before them (2 R. C. L., 223). Where the case is close on the facts or the point is not clearly established, error in the admission of evidence, especially when it tends to inflame the minds of the jury, may be ground for reversal. 38 Cyc., 1416; N., C. & St. L. Ry. v. Brundige, 114 Tenn., 31, 84 S. W., 805, 4 Ann. Cas., 887. But for such error to justify a reversal of the judgment, it must affirmatively appear that it has affected the results of the trial. Chapter 32, Acts of 1911, Code, sec. 10654. Under this rule no presumption of prejudice will be indulged from the mere fact that error was committed. 2 R. C. L., 220; 5 Michie's Digest, and cases cited.

Although there was much competent material evidence to support the finding that Mr. Mosley was not of sound mind and disposing memory, a number of witnesses, including two physicians who examined him after he executed the codicil, testified that in their opinion he was of sound mind. We do not weigh this testimony, but we consider it in endeavoring to determine whether or not the evidence was so close that the conclusion must be reached that the verdict on this issue was determined by passion or prejudice. The jury could reasonably accept the testimony of Dr. Huffman, the testator's regular physician, who had attended him constantly and who not only gave his definite opinion but also stated facts as to his mental and physical condition and his demeanor, that, if true, showed unmistakably an

unsoundness of mind. They could also accept the admissions of Jean Hager that the testator had "no more mind than a child," made at or just before the time the codicil was executed. The jury could, and doubtless did, conclude that this, and other competent evidence tending to show mental incompetency, could not be ignored. This court is unable to conclude that the aforesaid errors, which bore a large part upon the issue as to fraud and undue influence, affected the minds of the jury in finding that the testator was not of sound mind and disposing memory. The presumption arising under the rule of the statute (Code, sec. 10654) is not rebutted by the evidence improperly admitted and claimed to have prejudiced the proponent before the jury.

The rule of procedure applicable here is in principle the same as that provided by section 8824 of the Code, "If any counts in a declaration are good, a verdict for entire damages shall be applied to such good counts." In other words, where there is a general verdict, it will be applied to the count which was sustained by the evidence. Tennessee Central Railway Company v. Umenstetter, 155 Tenn., 235, 291 S. W., 452. In the instant case each of the special issues involved a determination of the cause if answered adversely to the proponent. The negative response to the issue as to mental capacity was determinative, as it was not dependent upon any finding upon the other issue. The judgment is therefore sustainable upon the finding upon the first issue.

■■ Complaint is urged of the allowance of questions and answers as to conduct of Jean Hager, after his qualification as executor in the county court, but after this contest was instituted, in withdrawing from a bank a large sum of money, placing it first in a safety deposit box in another bank, and later placing it in a cigar box and burying it under his house. His former counsel testified upon the second trial. Counsel for contestants read to him what purported to be admissions of these facts made by Jean Hager in his testimony given upon the first trial, and he asked the witness if Hager gave such testimony upon the first trial. It was not error to allow such questioning on cross-examination. Nor was it error to ask Mrs. Sydney Hager if she knew of her husband's said conduct and the reasons therefor. Such evidence would bear upon the issue of fraud and upon the good faith of the proponent in his insistence upon the validity of the codicil. Of course, the weight of it was for determination by the jury. Admissions by the proponent and sole beneficiary would be competent as bearing upon the issues. The jury could infer from this testimony that the purpose in so hiding the money after the contest was instituted was to place it beyond the reach of the law.

■ On cross-examination, Ex-Governor Roberts, formerly counsel for Mr. Mosley, was asked if Mr. Mosley had been held liable for debts of Carl Hager, Sr. The question was not incompetent, as it

related to the mental attitude of Mr. Mosley toward the contestants, the children of Carl Hager, and an affirmative answer would be beneficial to the proponent as tending to show a motive for excluding the contestants from the bounty of the testator. In any view it was harmless to the proponent.

The witness Marvin Bugg was asked as to the physical appearance of Mr. Mosley upon the occasion of his wife's death and burial—if he would look around with his eyes into space, staring, showing a lack of thought, with his mouth open. He answered in the affirmative. The questions were objected to as leading, and suggestive, and such they were, but no ruling thereon appears to have been made by the court. However, these facts were shown by other witnesses, and we do not think that the trial judge abused his discretion in failing to sustain the objection.

Dr. W. F. Fessey was asked if he knew why he was paid by Jean Hager for certain professional services rendered by him to Mr. Mosley, instead of Mr. Mosley paying him directly. This was a mere circumstance which might be looked to in connection with all the other evidence tending to show inability of the testator to attend to his own business, or that Jean Hager had control over him.

The witness J. B. Page testified that he thought Mr. Mosley was of sound mind; that he did not see anything wrong with his mind. On cross-examination he testified that Jean Hager wrote him to learn if a man named Moss was going to testify in the trial; that he told him that he did not find out anything. He was asked what business it was of his whether Moss testified or not, and he answered that it was not his business. The question and answer were of remote, if any, importance and were harmless.

Ex-Governor Roberts was asked what Jean Hager had been saying to Mr. Mosley between May of 1928, when Jean Hager came out of the penitentiary, and what he had been saying to or doing with Mr. Mosley until the time when the codicil was written in Jean Hager's presence; that is, was not Governor Roberts ignorant of those things; and he answered that he did not know anything about that, that he was not about them, that he had not seen either of them. The questions and answers were competent taken in connection with the testimony of Governor Roberts that at the time he wrote the codicil he thought Mr. Mosley was of sound mind and not under undue influence or the effect of fraud.

Carl Hager was asked by counsel as to the appearance of Mr. Mosley upon the occasion of the death of Mrs. Mosley. He testified without objection that he held his mouth open, saliva would come out over his lips and run down over his whiskers, and he would just stare around the room in a blank stare. Counsel then asked of him the question, "Did he sit there with the saliva drooling?" An objection made to this question was sustained. It was regarded as a

158

leading question. The witness had already made a statement which covered the question anyhow. The fact that the objection was sustained was sufficient in itself.

Mrs. L. S. Martin, a relative of Mrs. Mosley testifying for the proponent, said that Mrs. Mosley had told her that her grandchildren, the contestants, were treating her badly; that they hurt her feelings so badly that she could hardly live through it; and that one of the boys had told her, during a discussion, that if she would come down to the bottom of the steps he would kick her clear back to the top—using a coarse and vulgar word. She said that this occurred before the boy's father, Carl Hager, died—in 1924. She said that Mr. Mosley said that he was sorry for his wife, that it hurt his feelings to know that her grandchildren were thus mistreating her and that Carl would allow them to do that, but that "he didn't think Carl if he had his full say-so would allow it, because he thought his wife (Carl's wife) had some say into it, the way the children were mistreating her."

This and other testimony was given by Mrs. Martin, as tending to show the attitude of the testator toward these contestants.

On cross-examination, Mrs. Martin, in answer to questions, stated that she could not remember whether or not her own little children were in the room when Mrs. Mosley stated to her what the Hager boy had said to her. She was then asked by counsel for contestants as follows: "It just didn't make any impression on you about whether your little eight and nine year old girl and boy were present in the room when vulgar language was being used, did it?" She made no answer to this question. The question was asked as going to her credibility. Counsel had a right to ask her the question for this purpose. During the cross-examination of Mrs. Martin the trial judge asked her if her children were present upon this occasion. It was not error for the trial judge to ask the question. It was not an abuse of his privilege to ask questions that reasonably tend to clarify the evidence.

Mrs. Martin was further cross-examined at much length on this conversation with Mrs. Mosley, particularly as to the time when it occurred. She was uncertain as to the time. She thought it was in 1926 and that Jean Hager was living in Nashville at the time. Counsel then asked her:

"Why, Mrs. Martin, don't you know that in 1926 Mr. Hager had a furnished apartment in the Atlanta Penitentiary in Atlanta, Georgia, getting board and free room down there?

"Mr. Thomas: If the Court please we object to that kind of question as improper.

"The Court: Just eliminate the last part of it.

"Q. I withdraw the part about room, wasn't he in the Atlanta Penitentiary?

"Mr. Thomas: That part also about the furnished room and furnished apartment.

"The Court: Yes, you can ask her whether or not at that time he was in the Penitentiary."

The witness then answered: "I didn't state a certain year, I said after Cousin Lizzie went back to Lebanon he came down here to live."

The question asked by counsel was indeed sarcastic and the references to "free room and board" and "furnished apartment" were unnecessary, but they were withdrawn. Of course, if Jean Hager was in the penitentiary he had free room and board; and it cannot be held that such references were highly prejudicial to the proponent. The effect of them must have been nullified when the court ruled that they were improper and they were withdrawn.

The trial judge sustained objections to questions to witness Poston as to the general reputation of Jean Hager. Certainly the proponent is not in a position to complain of this refusal to admit testimony as to the general reputation of Jean Hager.

Counsel for the proponent requested the court to instruct the jury as follows:

"I charge you that the fact that the proponent may have had opportunities to influence the testator in making his will in favor of the proponent is not a sufficient fact to justify a finding of undue influence, unless there is some proof in the record from which you can say that the testator took advantage of his opportunities to induce a will favorable to him."

Such instructions were elaborately given in the charge of the court. Among other things the court instructed the jury as follows:

"To avoid a will on the ground of undue influence it must appear that the influence was upon the very act of making a will. The fact that the testator was under the general and even controlling influence of another person in the conduct of his affairs will not ordinarily suffice to invalidate the will, unless that influence was specifically exerted upon the testamentary act, and did to some extent mislead him to make a will essentially contrary to his duty or inclinations."

Two further requests for instructions were made and refused, as follows:

"I charge you that the character or reputation of the proponent in this case should not be considered by you in determining the question of the sanity or insanity of the testator. The testator had the right, if he so desired, to give his property to any person that he wished, without reference to the character or reputation of the beneficiary."

"I charge you further that the proponent of the will in this case is not on trial himself and his character or reputation is not at issue in the cause, so that it should not be considered by you for any purpose, he not having been a witness in the case."

██ Some text-writers and courts hold that the evidence which tends to show the character of a beneficiary charged with the practice of fraud or undue influence in bringing about the execution of a will is admissible if it tends to prove or disprove the existence of fraud or undue influence. Page on Wills (2 Ed.), sec. 765; Schouler on Wills, sec. 240; 40 Cyc., 1162, and cases cited. Heretofore in this opinion we have held, as to character testimony that the character of a party to a civil suit cannot be shown by specific acts, even on cross-examination. The general reputation of Jean Hager tending to reflect upon his real character could have been shown under proper questions. Such questions were asked and excluded. But, as hereinbefore shown, evidence bearing upon the character of the proponent was before the jury, unobjected to; and it was not improper for the jury to consider this evidence for what it was worth, upon the theory that a testator mentally competent would not leave all of his very considerable estate to a person who had been wayward and irresponsible, as claimed.

██ The instruction actually given, that "a man may freely make his will howsoever old he may be, for it is not the integrity of the body, but of the mind, that is requisite in making a will," covered substantially and in better form the instruction requested, that "the testator had the right, if he so desired, to give his property to any person that he wished, without reference to the character or reputation of the beneficiary." The latter statement lacked the qualification expressed in the instruction given.

While the proponent himself was not on trial as a direct issue, his general character or reputation could be considered by the jury, and this might be inferred from facts which were shown without objection, although he did not testify. A question before the jury was whether or not a man who had such character might practice fraud or exert an undue influence upon the old man, in his favor—not whether or not his testimony was to be believed.

Another request for instructions, made and refused, was as follows:

"I charge you further that in passing on the question of fraud or undue influence, you should consider only such facts as, in your opinion, tended to induce the execution of a will different from that which the testator wished or desired to execute; in other words, any conduct of the proponent which transpired after the execution of the will cannot be looked to as evidence of fraud or undue influence on the part of the proponent."

The first sentence of this request would be misleading. It would have tended to narrow the consideration of the evidence to that tending to show the codicil to be invalid. The explanatory clause as to conduct of the proponent after the execution of the codicil was embodied in another request and was given in instruction to the jury with the addition of the following:

"But conduct of the said Jean Hager, proponent of the codicil

and beneficiary thereunder, may be looked to as reflecting and shedding light on the question, whether or not the said Jean Hager practiced fraud or undue influence on the testator, J. L. Mosley, at the time of the execution of the codicil dated August 25, 1928.''

No complaint is made of this supplemental instruction.

Where the issues raised are fraud and undue influence, the range of inquiry as to the circumstances under which a will was executed is very wide. Any evidence, however slight, tending to prove those issues is fully admitted, for direct proof is rarely attainable. Schouler on Wills, secs. 240, 242. It is generally held that upon such issues every fact and circumstance, no matter how little its probative value, which throws light upon these issues, is admissible. The range of inquiry may cover, not only the provisions of the will itself, and the circumstances surrounding its execution, but also the mental condition of the testator, the motive and opportunity of others to influence him unduly, his relations with persons benefited by or excluded from the will, and the acts and declarations of such persons. Although none of these matters standing alone may be sufficient to establish the issues, yet taken together they may have that effect. 40 Cyc., 1155, 1162, and cases cited; Peery v. Peery, 94 Tenn., 328, 29 S. W., 1. The refusal of the aforesaid request did not, therefore, constitute reversible error.

Finally, the insistence that it was an abuse of discretion and error to tax all the costs of the cause against the proponent must be overruled. In the first place, this was a matter within the discretion of the trial judge. Code, sec. 9116. But also his honor was evidently of the opinion that the evidence warranted the verdict that the proponent and sole beneficiary had undertaken to set up a codicil knowing that the testator was incompetent to execute it, and knowing that it had been executed through his own contrivance, whether by fraud or undue influence, or by both. We are unable to conclude that the trial judge was not warranted in believing that this codicil was not sought by the proponent in good faith to be upheld—although his counsel, including the draftsman of the codicil, acted in good faith. The ordinary rule, that the nominated executor who acts in good faith is entitled to have the costs incurred by him in an unsuccessful effort to have the will probated paid out of the assets of the estate, is not applicable. Nobles v. Farmer, 9 Tenn. App., 6. In 40 Cyc., 1363, the general rule is well stated that ''a proponent who has been adjudged guilty of securing the execution of a will by fraud and undue influence should not be entitled to recover his costs from any source, but rather should be required to pay costs.''

It results that the judgment of the circuit court is affirmed, at the cost of the proponent, the plaintiff in error. The cause will be remanded to the circuit court in order that the verdict and judgment may be certified to the county court, to be entered of record.

Faw, P. J., and Crownover, J., concur.