IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 4, 2004 Session

## IN RE ESTATE OF TOY M. BEAN

**Appeal from the Chancery Court for Williamson County**
**No. P023177      R.E. Lee Davies, Judge**

---

**No. M2003-02029-COA-R3-CV - Filed December 1, 2005**

---

This appeal concerns a dispute among six siblings over the validity of their father's will. One month after his father's death, the youngest child filed a petition in the Chancery Court for Williamson County to probate a will his father had executed in July 1998. The testator's five older children contested this will on the grounds that their father lacked testamentary capacity and that the youngest child had procured the will by undue influence. Following a three day trial, a jury determined that the July 1998 will was invalid. After the trial court denied his post-trial motions, the youngest child appealed, taking issue with several evidentiary rulings, the adequacy of the instructions, and the evidentiary foundation for the verdict. We have determined that the trial court did not commit reversible error during the trial and that the record contains material evidence that the youngest child procured his father's July 1998 will by undue influence. We have also concluded that the trial court erred by requiring the estate to pay the youngest child's attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part
and Reversed in Part**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

William Carter Conway, Franklin, Tennessee, for the appellant, Robert G. Bean.

Virginia Lee Story and Henry Denmark Bell, Franklin, Tennessee, for the appellees, Lola Parks Blanchet, Coy Matthew Bean, Mary Katherine Harper, Beverly Ann Iott, and Roberta Lynn Faulkner.

**OPINION**

**I.**

Toy M. Bean was born in 1920 in rural Williamson County. Despite his lack of formal education, he became a successful businessman and farmer. He fought in World War II and rose to the rank of sergeant. Following his military service, he became a successful welder, and in 1947, he married Mary Francis Bean. They had six children together: Lola Parks Blanchet, Coy Matthew

Bean, Mary Catherine Harper, Beverly Ann Iott, and twins Roberta Lynn Faulkner and Robert Glen Bean. The Beans raised their children on a 24-acre farm in Franklin, Tennessee.

While working as a welder, Mr. Bean also farmed and raised livestock. In addition to these pursuits, he invested in real estate in the Franklin area and earned income from renting these properties. Mr. Bean had a keen business sense and earned a reputation in the community as a tough but fair negotiator. He worked hard to earn a living for himself and his family, and he taught his children the value of money and thoughtful spending.

When he turned sixty-one in 1981, Mr. Bean retired from welding and began a business making ladder racks in a shop on his farm. As the Beans' children grew up, they moved away from the farm to start their own families. Only the Beans' youngest son, Robert Bean, continued to live on the farm. Robert Bean drifted from job to job after graduating from high school, and eventually, Mr. Bean asked him to work with him in his ladder rack business.

The Bean family was close-knit as the children were growing up, and the children continued to have a close relationship with their parents even after leaving home. Mr. Bean and Ms. Bean experienced some turmoil in their marriage and, at one point, divorced, only to remarry and then separate. Ms. Bean died in 1996 leaving a will that divided her property equally among her six children. Following Ms. Bean's death, Mr. Bean and Robert Bean became the sole occupants of the family farm. However, Mr. Bean's five other children visited their father often. They arranged family gatherings, checked on him frequently, cleaned his house, and talked with him by telephone almost every night.

As time passed, Mr. Bean began to experience a decline in his health. In 1997, he was diagnosed with Type 2 diabetes, anemia, coronary artery disease, and a B-12 deficiency. Robert Bean was put in charge of making sure that his father received the care and medications he required. As a result of these and other medical problems, Mr. Bean became increasingly dependent on others for the first time in his life. He looked to Robert Bean and his other children for transportation and for assistance with his other needs.

Over the next year, Mr. Bean's older children began to experience difficulties contacting their father. Many times when they telephoned him, they would not receive an answer. When they made plans to visit him, they would find the farm house empty when they arrived. On occasion, Robert Bean denied his brothers and sisters access to the house. During this time, Robert Bean became more hostile toward his siblings, and they began to be concerned that he was using illegal drugs and drinking heavily at the house. When his siblings confronted Robert Bean with their suspicions, he became angry and, at times, violent.[1] On other visits to the house, the children found Mr. Bean very upset because Robert Bean had passed out from drinking.

---

[1]According to Lola Blanchet, Robert Bean lunged at her and Beverly Iott in a threatening manner when they confronted him about his illegal drug use and the persons he was permitting to come to the house. She stated that Robert Bean appeared to be "on drugs" at the time.

Robert Bean directed his hostility at Mr. Bean as well as his siblings. In 1997, Robert Bean telephoned his twin sister, Roberta Faulkner, to tell her that he had been arrested after he drove his truck through a gate on Mr. Bean's farm while chasing Mr. Bean. Mr. Bean apparently escaped to a neighbor's house and telephoned the authorities to tell them that he feared that Robert Bean was trying to kill him. On other similar occasions, when Mr. Bean attempted to call the police for help, Robert Bean warned his father that if he went to jail, no one would be left at home to care for him. Members of Mr. Bean's family also observed Robert Bean cursing, yelling, threatening, and throwing objects at his father.[2] Overall, the Bean family noticed that Mr. Bean appeared to be afraid of his son and that he acted differently whenever his son was present. They began to believe that Robert Bean was exerting too much control over their father.

Mr. Bean decided to execute a will in February 1998. He left the 24-acre farm to his six children. While he left the farmhouse and four surrounding acres to Robert Bean, he did not specify how the remaining property should be divided. He did specifically request, however, that none of the children sell the farm property without the consent of the other children. He left another piece of property to Coy Bean and Robert Bean and provided that the remainder of his estate should be placed in trust for his six children and divided equally among them by paying $5,000 to each child until the property was exhausted. Mr. Bean named Lola Blanchet and Beverly Iott as his executors and also executed a power of attorney authorizing them to conduct his business affairs.

Mr. Bean decided to share the contents of his February 1998 will with his children soon after he executed it. When several of his older children expressed concerns regarding how the farm property should be divided, Mr. Bean suggested that they divide the property into equal tracts and have a random drawing. He became upset when some of his children disapproved of this idea. Thereafter, the older children overheard Robert Bean telling his father that they were only interested in putting him in a nursing home and then selling his farm.[3] They also heard Robert Bean tell his father to change his will because Coy Bean would be unable to manage the property that would be left to him.

Robert Bean's insinuations about his brother's and sisters' intentions to sell the family farm upset Mr. Bean a great deal. Despite their efforts to convince Mr. Bean that their primary concern was for his well-being and that they had no intention of selling the farm, the older children were unable to convince their father that they did not intend to frustrate his desire to keep the farm in the family. On June 10, 1998, Robert Bean arranged with a lawyer to prepare a new will for his father.[4]

---

[2]Mr. Bean's grandchild testified that he saw Robert Bean throw weights and pieces of steel at Mr. Bean and that when Robert Bean was not sober, he acted "pretty hateful."

[3]For example, Mary Harper overheard Robert Bean telling his father that his older children were greedy and that they did not care about him. She also testified that Robert Bean warned her that if she would not go along with what he told her to do, she would get nothing from her father.

[4]Although Robert Bean denies that he made the call to the attorney, the attorney's legal secretary took a message when the attorney was not immediately available, which read "Toy Bean's son, Robert, phoned; wants to change will." We are convinced by this evidence that Robert Bean did in fact call the attorney about changing Mr. Bean's will.

On July 14, 1998, Robert Bean drove his father to the lawyer's office, and Mr. Bean executed a new will leaving his entire estate to Robert Bean. He also named Robert Bean as his executor and replaced the February 1998 power of attorney with a new power of attorney authorizing Robert Bean to conduct his business affairs. While executing his new will, Mr. Bean told the lawyer that he had decided to change his will because he was angry with his daughters. Neither Mr. Bean nor Robert Bean revealed to the other family members that Mr. Bean had executed a new will.

Mr. Bean's health began to decline rather rapidly after he executed the new will. He had missed a doctor's appointment on the day he executed the new will. Even though Mr. Bean's physician reminded Robert Bean that his father had missed the appointment, Robert Bean did not make another appointment for his father until January 1999 when Mr. Bean complained of chest pains. Mr. Bean eventually had open heart surgery in July 26, 1999 to replace a valve and to engraft three bypasses. He remained hospitalized for approximately two weeks. On August 11, 1999, shortly after Mr. Bean's release from the hospital, Robert Bean's name was added to two of Mr. Bean's bank accounts.[5] Three days later, Mr. Bean returned to the hospital complaining of shortness of breath. His physician determined that his medication was not being administered properly.

A short time later, the Department of Human Services received a referral that Mr. Bean was being abused, neglected, or exploited, and in September 1999, adult protective services workers began looking into the matter. Mr. Bean was again admitted to the hospital on October 4, 1999 with an acute rib fracture. He insisted that he had fallen from some steps.

During the next several years, Mr. Bean was frequently hospitalized, and his dementia worsened. Robert Bean continued to live with Mr. Bean in the farmhouse except for a six month period between November 2001 and April 2002 when he was incarcerated for a DUI conviction.[6] Robert Bean's girlfriend stayed in the farmhouse with Mr. Bean while Robert Bean was in jail.

Lola Blanchet became increasingly concerned that Robert Bean was dissipating Mr. Bean's assets. On January 14, 2002, on the advice of Mr. Bean's physician, Ms. Blanchet filed a petition in the Chancery Court for Williamson County seeking the appointment of a conservator for Mr. Bean. The trial court granted the petition and appointed an attorney practicing in Franklin as Mr. Bean's conservator. The court also appointed a guardian ad litem for Mr. Bean to make sure that his home was sanitary and that he was regularly receiving food and his medication. After being appraised of the older children's difficulties obtaining access to their father, the trial court specifically ordered that Mr. Bean's children would be permitted to visit Mr. Bean in his home and to bring him food. In addition, the court specifically ordered Robert Bean's girlfriend to make sure that Mr. Bean received his medication.

---

[5]No one else's name had ever been on one of Mr. Bean's accounts before, including his wife. The first account had a balance of $30,340.72 when Robert Bean's name was added to it. Robert Bean wrote several checks on this account and in June 2001, the account had a negative balance of $32.25. On the second account, Robert Bean made a withdrawal in the amount of $4,000 the day his name was added.

[6]Mr. Bean spent $23,000 for Robert Bean's DUI defense.

On April 4, 2002, a neighbor found Mr. Bean lying in a field with a broken hip. Mr. Bean never fully recovered from this injury, and he died ten days later on April 14, 2002. On May 14, 2002, Robert Bean filed a petition in the Chancery Court for Williamson County seeking to probate his father's July 14, 1998 will. Mr. Bean's five other children were surprised to learn that their father had executed a new will, and on May 20, 2002, they filed a petition to contest the July 1998 will and for the appointment of an administrator ad litem. Following a hearing, the trial court removed Robert Bean as executor and appointed an administrator ad litem.

The case was tried to a jury in May 2003. The children contesting the July 1998 will insisted that Robert Bean had exerted undue influence over their 81-year-old father as his mental and physical health deteriorated. They testified that Robert Bean had taken advantage of their father by inveigling him to change his will and to give him access to their father's bank accounts. They also testified that Robert Bean had purposely set out to alienate them from Mr. Bean and that he had dissipated their father's estate. For his part, Robert Bean insisted that Mr. Bean executed the July 14, 1998 will because his older children were pressuring him to sell the family farm and divide the proceeds between them. After denying Robert Bean's motion for a directed verdict, the trial court submitted the case to the jury, and after deliberating for less than two hours, the jury returned a verdict that the July 14, 1998 will was invalid. The trial court thereafter denied Robert Bean's post-trial motions, and Robert Bean appealed.

## II.
### THE DENIAL OF ROBERT BEAN'S MOTION IN LIMINE

Robert Bean first takes issue with the trial court's denial of his motion in limine seeking to limit the evidence regarding his father's mental capacity and his alleged undue influence. He insists that the court should have limited this evidence to events and conduct immediately surrounding the execution of the July 1998 will, and that the court erred by admitting testimony regarding acts and events between 1990 and 2003. Mr. Bean's other children respond that evidence relevant to undue influence and testamentary capacity spanning several years before and after the execution of a will is admissible in will contest cases. We have determined that the trial court did not err by denying Robert Bean's motion in limine.

Appellate courts review decisions concerning the admission or exclusion of evidence using the "abuse of discretion" standard of review. *Mercer v. Vanderbilt Univ.*, 134 S.W.3d 121, 131 (Tenn. 2004); *Dockery v. Board of Prof'l Responsibility*, 937 S.W.2d 863, 866 (Tenn. 1996); *Leonard v. Knox County*, 146 S.W.3d 589, 597 (Tenn. Ct. App. 2004). This standard implicitly recognizes the existence of a range of permissible alternatives. It is intended to be a review constraining concept implying less intense appellate review and, therefore, less likelihood of reversal. *Johnson v. Nissan N. Am., Inc.*, 146 S.W.3d 600, 604 (Tenn. Ct. App. 2004); *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193-94 (Tenn. Ct. App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222-23 (Tenn. Ct. App. 1999).

Even though a testator's testamentary capacity at the moment he or she executed the will is the pivotal issue in a will contest case, the courts have recognized that evidence of the testator's

mental and physical condition both before and after the execution of the will, within reasonable limits, is admissible to prove the testator's condition at the time the will was signed. *In re Estate of Mayes*, 843 S.W.2d 418, 427 (Tenn. Ct. App. 1992). When courts are called upon to determine what these reasonable limits are, they should keep in mind that in most cases, the mental capacity of the testator cannot be discerned simply by the appearance and conduct of the testator at the moment of executing the will. 3 WILLIAM J. BOWE AND DOUGLAS H. PARKER, PAGE ON THE LAW OF WILLS § 29.58, at 637 (3rd ed., rev. vol. 2004) (PAGE ON WILLS). Accordingly, it is generally recognized that a testator's "conduct, emotions, methods of thought, and the like, a very considerable period before and after the execution of the will, is admissible to show his capacity at the moment of making the will." 3 PAGE ON WILLS § 29.58, at 638.

The scope of the evidence relevant to a claim of undue influence is also quite broad. *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001); 1 JACK W. ROBINSON & JEFF MOBLEY, PRITCHARD ON THE LAW OF WILLS AND ADMINISTRATION OF ESTATES § 148, at 232 (5th ed. 1994) (PRITCHARD ON WILLS). As this Court has stated:

> It is generally held that upon such issues every fact and circumstance, no matter how little its probative value, which throws light upon these issues, is admissible. The range of inquiry may cover, not only the provisions of the will itself, and the circumstances surrounding its execution, but also the mental condition of the testator, the motive and opportunity of others to influence him unduly, his relations with persons benefited by or excluded from the will, and the acts and declarations of such persons. Although none of these matters standing alone may be sufficient to establish the issues, yet taken together they may have that effect.

*Hager v. Hager*, 17 Tenn. App. 143, 161, 66 S.W.2d 250, 260 (1933).

In terms of the time range of admissible evidence for undue influence, "[e]vidence which tends to prove or disprove the subordination of the will of the testator to others must, except in extreme cases, take a very wide range." 3 PAGE ON WILLS § 29.78, at 691. When a beneficiary to a will is suspected of exerting undue influence over the testator, "[e]vidence which tends to show that the beneficiary acquired control over [the] testator's mind before the will was made, and retained such control beyond the period at which the will was executed, is admissible, even if such evidence relates to a remote period of time." 3 PAGE ON WILLS § 29.78, at 692.

In this case, the trial court allowed evidence regarding Mr. Bean's mental capacity and Robert Bean's alleged undue influence that spanned several years before and after the execution of the will. Rather than requesting that specific evidence be excluded, Robert Bean simply requested the trial court to limit the testimony to around the time that the July 1998 will was executed. Given the fact that there are no set time limitations as to when evidence becomes too remote to be admitted, along with the broad range of evidence that is typically admissible to show mental capacity and undue influence, the trial court did not abuse its discretion by refusing to set a time limit for the

admissibility of evidence before the trial. Therefore, it did not err in denying Robert Bean's motion in limine.

## III.
### THE ADMISSION OF DR. TRAMONTANA'S DEPOSITION TESTIMONY

Robert Bean also takes issue with the trial court's decision to admit the deposition of Dr. Michael Tramontana, a clinical psychologist who evaluated Mr. Bean in 2002. Robert Bean insists that Dr. Tramontana's testimony is too remote to be relevant with regard to Mr. Bean's mental capacity in 1998. We have determined that the trial court did not err by allowing the jury to consider Dr. Tramontana's testimony.

Dr. Matthew J. Abbate, Mr. Bean's primary care physician, referred Mr. Bean to Dr. Tramontana in early 2002. Dr. Tramontana concluded that Mr. Bean was suffering from a form of dementia that was not due to ordinary aging. Based on a 1999 CT scan revealing advanced brain atrophy, Dr. Tramontana concluded that the change in Mr. Bean's mental capacity had not been sudden but rather had been gradual, spanning a period of years. This evidence is relevant and not too remote in light of our holding in Section II as to the permissible scope of evidence in will contest cases regarding the testator's mental capacity. Accordingly, the trial court did not err by admitting Dr. Tramontana's testimony concerning Mr. Bean's mental capacity.

## IV.
### THE ADMISSIBILITY OF CONSERVATORSHIP EXPENSES

Robert Bean next takes issue with the trial court's refusal to permit him to cross-examine Coy Bean regarding the costs associated with the conservatorship. He asserts that the trial court erred by holding that this testimony was irrelevant and that Coy Bean lacked personal knowledge of this information. We conclude that the trial court did not err in limiting the scope of Robert Bean's cross-examination of Coy Bean.

Robert Bean attempted to cross-examine Coy Bean regarding the expenses associated with the conservatorship that had been established in January 2002. Coy Bean was not directly involved in the appointment of a conservator for Mr. Bean,[7] and both the conservator and the guardian ad litem had been under the court's direction and had submitted periodic statements regarding their expenses. Accordingly, the information sought by Robert Bean had been readily available.

A witness may not give evidence regarding matters about which he or she has no personal knowledge. Tenn. R. Evid. 602. The advisory commission comments to Tenn. R. Evid. 602 state that "[b]asic to relevancy concepts is that a witness must know about the subject matter of testimony." Because no evidence was introduced that Coy Bean had first hand knowledge as to the costs of the conservatorship, the trial court did not err in excluding his testimony on the grounds of relevancy.

---

[7]Lola Blanchet petitioned for the conservatorship.

# V.
## THE MOTION FOR A DIRECTED VERDICT

Robert Bean also asserts that the trial court erred by denying his motion for a directed verdict at the close of his siblings' case-in-chief. He insists that at that stage of the proceeding, his brother and sisters had proven only a "glimmer" of undue influence, at best. We have determined that the trial court did not err by declining to direct a verdict for Robert Bean at the close of his siblings' proof.

Directed verdicts under either Tenn. R. Civ. P. 50.01 are appropriate only when reasonable minds cannot differ as to the conclusions to be drawn from the evidence. *Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000); *Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994); *Ingram v. Earthman*, 993 S.W.2d 611, 627 (Tenn. Ct. App. 1998). A case should not be taken away from the jury, even when the facts are undisputed, if reasonable persons could draw different conclusions from the facts. *Gulf, M. & O. R.R. v. Underwood*, 182 Tenn. 467, 474, 187 S.W.2d 777, 779 (1945); *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 891 (Tenn. Ct. App. 1995).

In appeals from a directed verdict, the reviewing courts do not weigh the evidence, *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Benton v. Snyder*, 825 S.W.2d 409, 413 (Tenn. 1992), or evaluate the credibility of the witnesses. *Benson v. Tenn. Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Instead, they review the evidence in the light most favorable to the motion's opponent, give the motion's opponent the benefit of all reasonable inferences, and disregard all evidence contrary to that party's position. *Alexander v. Armentrout*, 24 S.W.3d at 271; *Eaton v. McLain*, 891 S.W.2d at 590; *Smith v. Bridgestone/Firestone, Inc.*, 2 S.W.3d 197, 199 (Tenn. Ct. App. 1999).

At the close of their case-in-chief, Mr. Bean's older children submitted evidence that Robert Bean had been hostile and violent toward Mr. Bean and his brother and sisters. They testified that Robert Bean (1) had interfered with their efforts to remain in contact with their father, (2) had prejudiced their father against them, and (3) had been actively involved in procuring their father's July 1998 will. They also submitted evidence that Mr. Bean's mental capacity steadily deteriorated during the final years of his life. Construing this evidence in the light most favorable to the older children and giving them the benefit of all the reasonable inferences, we have determined that Robert Bean was not entitled to a directed verdict at the close of the older children's case-in-chief because reasonable persons could have differed concerning whether Mr. Bean lacked testamentary capacity when he executed his July 1998 will or whether Robert Bean procured his father's July 1998 will by undue influence. Accordingly, the trial court did not err by denying Robert Bean's motion for a directed verdict.

# VI.
## THE JURY INSTRUCTIONS

Robert Bean also takes issue with the jury instructions. He insists that they invited the jury to substitute its own notions of fairness for Mr. Bean's judgment regarding the disposition of his

property.  Robert Bean candidly concedes that he failed to take issue with these instructions at trial. Accordingly, we have determined that he cannot take issue with the instructions for the first time on appeal.  Tenn. R. App. P. 36(a); *Forde v. Fisk Univ.*, 661 S.W.2d 883, 887 (Tenn. Ct. App. 1983); *Provence v. Williams*, 62 Tenn. App. 371, 381, 462 S.W.2d 885, 890 (1970).

## VII.
### THE EVIDENTIARY SUPPORT OF THE JURY'S VERDICT

As a final matter, Robert Bean takes issue with the evidentiary support of the jury's verdict. He insists that the record lacks material evidence that Mr. Bean lacked testamentary capacity when he executed his July 1998 will or that the July 1998 will was procured by undue influence.  We have determined that while the evidence does not support a conclusion that Mr. Bean lacked testamentary capacity when he executed his July 1998 will, the record contains material evidence supporting the jury's decision that Robert Bean procured the July 1998 will by undue influence.

### A.
### The Standard of Review

Tennessee's traditional standard for reviewing the evidentiary foundation of a jury's verdict is codified in Tenn. R. App. P. 13(d). The rule provides that "[f]indings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict."  Appellate courts employing this standard may not review the evidence de novo, *Alexander v. Armentrout*, 24 S.W.3d at 271, nor may they weigh the proof to determine where the preponderance of the evidence lies.  *Reynolds v. Ozark Motor Lines, Inc*., 887 S.W.2d 822, 823 (Tenn. 1994); *Overstreet v. Shoney's, Inc*., 4 S.W.3d 694, 718 (Tenn. Ct. App. 1999).  Rather, appellate courts must (1) take the strongest legitimate view of the evidence that favors the verdict, (2) assume the truth of all evidence that supports the verdict, and (3) allow all reasonable inferences to sustain the verdict.  *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000); *Dickey v. McCord*, 63 S.W.3d 714, 719 (Tenn. Ct. App. 2001). If the record contains any material evidence to support the verdict, the judgment based on the verdict must be affirmed.  *Crabtree Masonry Co. v. C & R Constr., Inc*., 575 S.W.2d 4, 5 (Tenn. 1978); *Moss v. Sankey*, 54 S.W.3d 296, 298-99 (Tenn. Ct. App. 2001).

A challenge to the evidentiary foundation of a jury's verdict in a civil case requires a reviewing court to search the record to ascertain whether material evidence supporting the verdict is present. *Hohenberg Bros. Co. v. Missouri Pac. R.R.*, 586 S.W.2d 117, 119 (Tenn. Ct. App. 1979). The concept of materiality does not relate to the weight of evidence. Rather, it involves the relationship between the proposition that the evidence is offered to prove and the issues in the case. *Knoxville Traction Co. v. Brown*, 115 Tenn. 323, 331, 89 S.W. 319, 321 (1905) (holding that material evidence is evidence material to the question in controversy); 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 185, at 637 (5th ed. 1999).  Evidence that does not relate to a matter in issue is immaterial.  *People v. Torrez*, 37 Cal. Rptr. 2d 712, 717 (Ct. App. 1995); *Getz v. State*, 538 A.2d 726, 731 (Del. Super. Ct. 1988); *Nahmias Realty, Inc. v. Cohen*, 484 N.E.2d 617, 621 (Ind. Ct. App. 1985); *Town of Silver City v. Silver City Police Officers Ass'n*, 115 N.M. 628, 857 P.2d 28, 32 (N.M. 1993); *Evans-Smith v. Commonwealth*, 5 Va. App. 188, 361 S.E.2d 436, 441 (Va. Ct. App.

1987). Thus, Tenn. R. App. P. 13(d) requires the reviewing court to determine whether the record contains any evidence relating to the matters in issue which, when reviewed in a light most favorable to the prevailing party, supports the jury's verdict.

The appellate courts review the evidentiary foundation of a jury's verdict in will contest cases using the same rules used to review jury verdicts in other civil cases. *Thomas v. Hamlin*, 56 Tenn. App. 13, 22, 404 S.W.2d 569, 573 (1964). The purpose of a will contest is to have a will declared void either because the testator lacked the requisite testamentary capacity or because the will was procured by undue influence or fraud. *Stacks v. Saunders*, 812 S.W.2d 587, 590-91 (Tenn. Ct. App. 1990); *Muse v. Sluder*, 600 S.W.2d 237, 240 (Tenn. Ct. App. 1980). It is impossible to determine from the jury's verdict in this case whether it declared the will void because of a lack of testamentary capacity or because of undue influence. Therefore, we must examine the entire record to ascertain whether it contains any evidence that supports that Mr. Bean's will was either a product of testamentary incapacity or undue influence.

## B.
## Mr. Bean's Testamentary Incapacity

Robert Bean insists that the record does not contain material evidence supporting the conclusion that Mr. Bean lacked testamentary capacity when he executed his July 1998 will. While Mr. Bean's children presented substantial evidence regarding Mr. Bean's mental capacity toward the end of his life, we have determined that his older children did not prove that he lacked testamentary capacity when he executed his will on July 14, 1998.

Persons who execute wills must, at the moment of execution, understand what they are doing and the consequences of their action. As the Tennessee Supreme Court has repeatedly noted, a person executing a will must know and understand (1) the nature and the effect of his or her act, (2) the property he or she possesses, and (3) the manner in which his or her property will be distributed under the will. *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002); *In re Estate of Elam*, 738 S.W.2d 169, 171-72 (Tenn. 1987). Executing a will requires less mental capacity than engaging in business transactions.[8] *Owen v. Summers*, 97 S.W.3d 114, 125 (Tenn. Ct. App. 2001); *Green v. Higdon*, 870 S.W.2d 513, 522 (Tenn. Ct. App. 1993). In common terms, a person has the capacity to execute a will if he or she knows and understands what he or she is doing. *In re Estate of Elam*, 738 S.W.2d at 171-72; *American Trust & Banking Co. v. Williams*, 32 Tenn. App. 592, 602, 225 S.W.2d 79, 83-84 (1948).

The inquiry into the testator's mental capacity must necessarily focus on the time when the testator executed the will. *In re Estate of Oakley*, 936 S.W.2d 259, 260 (Tenn. Ct. App. 1996); *Harper v. Watkins*, 670 S.W.2d 611, 628-29 (Tenn. Ct. App. 1983); *Melody v. Hamblin*, 21 Tenn. App. 687, 695, 115 S.W.2d 237, 242 (1937). However, evidence of the testator's mental and

---

[8] The factors to be considered in determining a person's capacity to contract are discussed in *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001). Unlike business transactions, a person executing a will is not required to act with judgment and discretion. 1 PRITCHARD ON WILLS § 103, at 168.

physical condition before and after executing the will, within reasonable limits, is admissible. *In re Estate of Elam*, 738 S.W.2d at 172; *In re Estate of Mayes*, 843 S.W.2d at 427. The limits on the period of time to be considered are within the trial court's discretion. *McCormack v. Riley*, 576 S.W.2d 358, 360 (Tenn. Ct. App. 1978). When called upon to set these limits, the courts should be mindful of the fact that in most cases, the mental capacity of the testator cannot be discerned simply by the appearance and conduct of the testator at the moment of executing the will. 3 PAGE ON WILLS § 29.58, at 637. Therefore, admission of the testator's "conduct, emotions, methods of thought, and the like, a very considerable period before and after the execution of the will, is admissible to show his capacity at the moment of making the will." 3 PAGE ON WILLS § 29.58, at 535.

Most of the evidence Mr. Bean's older children presented regarding his mental capacity focused on events and conduct that occurred well after July 1998. While they proved that Mr. Bean lacked testamentary capacity during the final months of his life, they failed to prove that he lacked testamentary capacity on July 14, 1998 when he executed his will. Their evidence demonstrated that Mr. Bean was limited by his age and health in July 1998, but they failed to establish that he neither knew nor understood what he was doing when he executed his July 1998 will.

### C.
### Robert Bean's Undue Influence

Robert Bean also insists that the record does not contain sufficient material evidence to permit the jury to determine that he exerted undue influence to procure his father's July 1998 will. He argues that the evidence demonstrates that Mr. Bean changed his will at his own volition. We have determined that the record contains material evidence supporting a conclusion that Robert Bean procured his father's will using undue influence.

While undue influence may be proved either by direct or circumstantial evidence, direct evidence of undue influence is rarely available. Accordingly, in most cases, parties contesting a will on the ground that it was procured by undue influence must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently. *Kelley v. Johns*, 96 S.W.3d 189, 195 (Tenn. Ct. App. 2002); *Fell v. Rambo*, 36 S.W.3d 837, 847 (Tenn. Ct. App. 2000); *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989). Whether the suspicious circumstances relied upon by the contestants are sufficient to invalidate a will should be "decided by the application of sound principles and good sense." *Halle v. Summerfield*, 199 Tenn. 445, 454, 287 S.W.2d 57, 61 (1956); *In re Estate of Maddox*, 60 S.W.3d at 89.

The courts have not attempted to catalogue the types or number of suspicious circumstances needed to invalidate a will, but, as we have already discussed, the scope of relevant evidence is quite broad. The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary, (2) the testator's physical or mental deterioration, and (3) the beneficiary's active involvement in procuring the will. *In re Estate of Elam*, 738 S.W.2d at 173; *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Estate of Hamilton v. Morris*, 67 S.W.3d 786, 792 (Tenn. Ct. App. 2001). Other circumstances

include: (1) secrecy concerning the will's existence, (2) the unjust or unnatural nature of the will's terms, (3) discrepancies between the will and the testator's expressed intentions, and (4) fraud or duress directed toward the testator. *Kelley v. Johns*, 96 S.W.3d at 196; *Mitchell v. Smith*, 779 S.W.2d at 388.

Proof of the existence of a confidential relationship, by itself, will not be sufficient to invalidate a will. *Halle v. Summerfield*, 199 Tenn. at 455, 287 S.W.2d at 61; *In re Estate of Maddox*, 60 S.W.3d at 89. It is not the relationship that concerns the courts but rather the abuse of the relationship. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). Proof of the existence of a confidential relationship must be coupled with evidence of one or more other suspicious circumstances that give rise to a presumption of undue influence. *DeLapp v. Pratt*, 152 S.W.3d 530, 540 (Tenn. Ct. App. 2004). Accordingly, proof that a beneficiary had a confidential relationship, such as an unrestricted power of attorney, coupled with evidence of a transaction or gift to the beneficiary creates a presumption of undue influence. *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995); *Johnson v. Craycraft*, 914 S.W.2d 506, 510 (Tenn. Ct. App. 1995).

Once a contestant presents sufficient evidence to substantiate an undue influence claim, the burden of going forward shifts back to the will's proponent to prove by clear and convincing evidence that the challenged transaction or gift was fair. *Matlock v. Simpson*, 902 S.W.2d at 386; *DeLapp v. Pratt*, 152 S.W.3d at 540; *Hager v. Fitzgerald*, 934 S.W.2d 668, 671 (Tenn. Ct. App. 1996). Like the proof of suspicious circumstances, the scope of the evidence regarding the fairness of a transaction or gift is quite broad. Frequently, a will's proponents prove the fairness of a transaction by presenting evidence that the testator received independent advice. *Matlock v. Simpson*, 902 S.W.2d at 386; *Richmond v. Christian*, 555 S.W.2d 105, 107-08 (Tenn. 1977); *see also In re Estate of Elam*, 738 S.W.2d at 174 (the testator must receive "competent and independent advice, free from the influence of the donees"). The testator must have the opportunity to confer fully and privately with a person competent to inform him or her of the legal effect of the intended bequests. *See Turner v. Leathers*, 191 Tenn. 292, 297 (Tenn. 1950). However, proof of independent advice becomes necessary only when it would be difficult to show the fairness of the transaction or the competency of the testator without it. *In re Estate of Depriest*, 733 S.W.2d 74, 79 (Tenn. Ct. App. 1986).

Mr. Bean's older children presented a substantial amount of evidence regarding the suspicious circumstances surrounding Mr. Bean's July 1998 will. They proved that Robert Bean had a confidential relationship with Mr. Bean and that Robert Bean not only exercised dominion and control over his father, he also intimidated Mr. Bean physically and mentally. They also proved that Robert Bean purposely alienated his father against his older children and attempted to restrict their access to their father. In addition, they proved that Robert Bean was actively involved in procuring his father's July 1998 will and that he concealed the existence of this will until after Mr. Bean died. Finally, they proved that the terms of the July 1998 will were dramatically different from the terms of his February 1998 will and that it was inconsistent with Mr. Bean's expressed intention to divide his farm among his six children.

Viewed in its entirety, the record contains ample evidence that Mr. Bean did not act freely and independently when he executed his July 1998 will. Therefore, we conclude that the evidence contains material evidence supporting the jury's verdict invalidating Mr. Bean's July 1998 will.

## VIII.
### THE ESTATE'S LIABILITY FOR ROBERT BEAN'S ATTORNEY'S FEES

Mr. Bean's older children take issue with the trial court's decision to require Mr. Bean's estate to pay Robert Bean's attorney's fees. They insist that Robert Bean is not entitled to have his legal expenses paid by the estate because the jury concluded that he procured the will using undue influence. The proponent of a will who procured the will through undue influence is responsible for his or her own attorney's fees, *Smith v. Haire*, 133 Tenn. 343, 346, 181 S.W. 161, 162 (1915), and for the costs of the will contest. *Kelley v. Johns*, 96 S.W.3d at 199 n.5.

We have examined this record to determine whether there is any factual basis for concluding that Robert Bean probated this will in good faith, notwithstanding his conduct in procuring the will. While the jury did not explicitly state whether its verdict was based on Mr. Bean's lack of testamentary capacity or on Robert Bean's undue influence, we have determined that the record contains sufficient material evidence to support the conclusion that Robert Bean procured Mr. Bean's July 14, 1988 will through undue influence. Accordingly, we find that the trial court erred by requiring Mr. Bean's estate to pay the attorney's fees Robert Bean incurred as a result of this will contest proceeding.

## IX.

We affirm the judgment invalidating Mr. Bean's July 14, 1998 will and reverse the portion of the judgment awarding Robert Bean his attorney's fees. We remand the case to the trial court for further proceedings consistent with this opinion. We also tax the costs of this appeal to Robert Bean and his surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.