# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 18, 2014 Session

## AMBER L. BILBREY v. MELISSA LYNN PARKS

**Appeal from the Circuit Court for Cumberland County**
**No. CV005252      Amy V. Hollars, Judge**

---

### No. E2013-02808-COA-R3-CV-FILED-SEPTEMBER 29, 2014

---

This negligence case arises out of a car accident. Plaintiff Amber L. Bilbrey, while driving from Mayland to Monterey with her boyfriend and her aunt, ran out of gas. They turned around and tried to get the car back to Mayland by a combination of "running on fumes" and pushing the car. When they could push no longer, Bilbrey parked the car on the side of the road. Because there was a parallel ditch on the shoulder of the road, a part of the parked car extended into the roadway. Bilbrey stayed with the car while the others went for gas. The defendant, Melissa Lynn Parks, was driving toward Mayland and ran into the back of Bilbrey's car, causing injury to both of them. After a five-day trial, the jury returned a verdict finding both Bilbrey and Parks to be 50% at fault. The trial court entered a judgment in accordance with the jury verdict. The issues raised on appeal are whether the trial court erred in admitting (1) the deposition testimony of Bilbrey's boyfriend after the court found him "unavailable" because he was allegedly more than 100 miles from the courthouse, and (2) the testimony of a state trooper regarding the content of a voice message sent by Bilbrey to her boyfriend shortly before the accident. Finding no prejudicial error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

Henry S. Queener, Nashville, Tennessee, for the appellant, Amber L. Bilbrey.

Robert A. Crawford, Knoxville, and Jay R. McLemore, Brentwood, Tennessee, for the appellee, Melissa Lynn Parks.

# OPINION

## I.

On the evening of March 11, 2010, Bilbrey, along with her aunt, Charity Naser and her then-boyfriend, Kyle Culver, the father of her child, left from Mayland heading for Monterey on U.S. Highway 70N. No one checked the gas gauge. Several miles into the trip, the car's engine began to sputter. Bilbrey, concerned that her car was running out of gas, turned the car around and headed back to Mayland, hoping to make it to a gas station. The car – a Chevrolet Cavalier – sputtered along, running on the remaining "fumes," and when it "died," Culver and Naser got out of the car and pushed it. They made it to the Cove Market and Gas Station, but the market was not open for business and had no gas available. They continued to push the car past the market and stopped when the road began to incline and they could go no further. They pushed the car off the road as far as possible without going in a ditch. The witnesses were not entirely clear on how much of the car remained in the roadway, but it was a significant portion, perhaps approximately one-third of the car's width.

Culver and Naser started walking toward Mayland while Bilbrey stayed with the car. Culver and Naser were picked up by a passing truck. The truck driver gave them a lift into town. They got a gas can, filled it, and headed back toward the stranded car. By this time, it was dark. Bilbrey, Naser, and Culver all agreed in their testimony that earlier they had put the emergency blinker lights on when they realized the car was running out of gas.

Bilbrey got tired of sitting in the driver's seat and got out to sit on the car's hood. She said that the emergency blinkers stayed on up to the point that Parks collided with the rear end of her car. Bilbrey was sitting on the hood of the Cavalier at the time of impact.

Parks testified that she did not see the Bilbrey car until less than a second before the collision. She did not have time to apply her brakes before the impact. The stretch of Highway 70 on which Parks was driving immediately before the accident site is relatively straight and flat. Parks testified that there were no lights on the Cavalier.

Culver and Naser were walking back on U.S. 70N when the accident occurred. They heard a loud boom. An ambulance sped by a few minutes later, followed by a fire truck. Culver testified that after the fire truck passed, he started running. Another passerby truck picked up Naser, then Culver, and dropped them off at the accident scene.

Bilbrey brought this negligence action on July 16, 2010. Parks filed a counterclaim with her assertion of Bilbrey's negligence. The case was tried before a jury over the course of five days in September 2013. After trial had started, Parks secured the issuance of a

subpoena for Culver, which was returned unserved. After Bilbrey had rested her case in chief, Parks attempted to read Culver's deposition as proof, arguing that it was admissible under Tenn. R. Civ. P. 32.01(3) because Culver was "unavailable" as defined by Tenn. R. Evid. 804(a) since he was allegedly in Michigan, more than 100 miles from the courthouse. Bilbrey objected on the grounds that (1) Parks had not complied with Local Rule 19.03 of the 13th Judicial District Local Rules of Practice, which required that, in a jury case, "[s]ubpoenas for a local witness must be issued and dated by the clerk no later than seven (7) days before the trial and ten (10) days for out of county," and, according to Bilbrey, (2) Parks failed to demonstrate by competent proof that Culver was unavailable because Parks relied exclusively on inadmissible hearsay in attempting to demonstrate that Culver had moved to Michigan. The trial court allowed Parks to read Culver's deposition to the jury.

Parks also presented the testimony of David Roark, a sergeant with the Tennessee Highway Patrol, who responded to the accident, investigated the scene, and prepared a crash report. Sgt. Roark stated that on the night of the accident, he listened to a voicemail recording sent from Bilbrey to Culver's cell phone, in which Bilbrey asked where he and Naser were and said she was getting scared. Sgt. Roark couldn't remember exactly what Bilbrey said about the car's lights, but recalled that she said that the lights "had gone out," or "were going down," or were "getting low." Bilbrey objected on the grounds that Parks had not presented the best evidence of the voice message – the recording itself – and that Sgt. Roark's identification of the voice on the recording was insufficient authentication of the proferred evidence. Parks responded that the original recording and any copies had been lost or destroyed in the course of the three and a half years between the accident and trial. The trial court allowed Sgt. Roark to testify regarding the voicemail message.

As previously noted, the jury found both Bilbrey and Parks were 50% at fault. The trial court approved the verdict and entered judgment accordingly. Bilbrey timely filed a notice of appeal.

II.

Bilbrey raises the following issues, as quoted verbatim from her brief:

> Did the trial court err in presenting as evidence the deposition of witness Culver, who testified at deposition that he was less than 100 miles from the courthouse, and he was not [successfully] subpoenaed to trial, and for whom no witness could establish by non-hearsay that Culver had since moved more than 100 miles from the courthouse on the day of trial?

Did the trial court err in allowing a witness [Sgt. Roark] to testify as to the gist of phone message with no evidence establishing why the message was not available at trial and the message not meeting a hearsay exception?

(Paragraph numbering in original omitted.)

III.

The issues involve the correctness of the trial court's determinations of the admissibility of evidence. "Generally, the admissibility of evidence is within the sound discretion of the trial court." *Mercer v. Vanderbilt Univ.*, 134 S.W.3d 121, 131 (Tenn. 2004). "When arriving at a determination to admit or exclude even that evidence which is considered relevant trial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion." *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). As the Supreme Court has further stated,

> A trial court abuses its discretion when it causes an injustice by applying an incorrect legal standard, reaching an illogical decision, or by resolving the case "on a clearly erroneous assessment of the evidence." *Id.* The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Indeed, when reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999); *see also* *Keisling v. Keisling*, 196 S.W.3d 703, 726 (Tenn. Ct. App. 2005).

*Henderson v. SAIA, Inc.*, 318 S.W.3d 328, 335 (Tenn. 2010).

IV.

A.

We first address whether the trial court committed prejudicial error in allowing the deposition of Culver to be read to the jury as a part of the defense's proof-in-chief. Culver's

-4-

deposition was taken on June 8, 2011, two years and two months before trial. As noted, Local Rule 19.03 requires that, in a jury case, a party must issue a subpoena for a local witness no later than seven days before the trial, or ten days before trial for an out-of-county witness. Culver testified in his deposition that he resided at an address in Cumberland County. Parks expected Bilbrey to call Culver as a witness; her brief states that "[g]iven the relationship between Ms. Bilbrey and Mr. Culver, and the fact that Mr. Culver was the first name on Ms. Bilbrey's witness list, Ms. Parks could certainly assume that Ms. Bilbrey would call Mr. Culver in her case in chief." When it became apparent to Parks that this assumption was wrong, Parks caused a subpoena to be issued for Culver. Parks admits that the subpoena was not issued at least seven days before trial. At oral argument, her counsel admitted that this violation of Local Rule 19.03 was simply a "tactical error."

The subpoena was returned unserved. Over Bilbrey's objection, Parks attempted to read Culver's deposition into evidence. Parks argued that Culver was "unavailable" under Tenn. R. Evid. 804(a)(6), which provides that " '[u]navailability of a witness' includes situations in which the declarant . . . for depositions in civil actions only, is at a greater distance than 100 miles from the place of trial or hearing." Parks relied on Tenn. R. Civ. P. 32.01(3), which states that "[t]he deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds that the witness is 'unavailable' as defined by Tennessee Rule of Evidence 804(a)." In a conference out of the jury's presence, Parks called Edward Van Aalten, her attorney's paralegal assistant, who attempted to serve the subpoena on Culver. Van Aalten testified, over several hearsay objections, as follows:

> Q: You obtained a subpoena with the . . . last known address of Kyle Culver; is that correct?
>
> A: Yes.
>
> Q: Okay. And did you go to that location?
>
> A: I did.
>
> Q: And what did you find?
>
> A: It was a young lady there. Tonya – . . . Tonya Nelson. And she is the current resident there. Said she had lived there for more than a year.
>
> Q: Well, did Mr. Culver live there where he swore his address was in the deposition?

-5-

A: No, . . . Mr. Culver was not there.

Q: Okay. And did you talk to the landlord, as well as the resident that was living there where Mr. Culver used to live?

A: I did.

          *       *       *

Q: What did you learn?

A: Okay. The landlord was Mr. Terry Ammonette and he said Kyle Culver had moved . . . to Michigan some . . . time ago.

Q: How long ago, did he tell you?

A: He did not.

Q: The lady that was living there, how long had she lived there?

A: She said for more than a year, I think she said.

(Interspersed objections of counsel omitted.) The trial court found that Culver was unavailable and allowed Parks to read nearly all of his deposition to the jury under Tenn. R. Civ. P. 32.01(3).

Tennessee appellate courts have addressed the concept of "unavailability" as provided in Tenn. R. Evid. 804(a)(6) on several occasions. Both this Court and the Court of Criminal Appeals have observed that "[t]he burden of establishing unavailability is on the proponent of the evidence." *Wilkes v. Fred's, Inc.*, No. W2001-02393-COA-R3-CV, 2002 WL 31305202 at *5 (Tenn. Ct. App. W.S., filed Aug. 20, 2002); *State v. McCoy*, No. 01C01-9103-CR-00090, 1991 WL 242932 at *3 (Tenn. Crim. App., filed Nov. 21, 1991). In *Raines v. Shelby Williams Indus., Inc.,* the Supreme Court, addressing a similar question, held that the proponent had failed to meet this burden, stating:

> The defendant argues that . . . "the trial court erred in admitting the deposition of Dr. Norman Hankins, a vocational disability expert, into the record for proof."

          *       *       *

-6-

The defendant argues there was no proof the witness was "unavailable," as defined by the Rule, and that the witness is not exempt from subpoena to trial pursuant to Tenn. Code Ann. § 24-9-101, which provides:

> . . . Deponents exempt from subpoena to trial but subject to subpoena to a deposition are:
> . . . .
> (6) *A practicing physician, psychologist,* chiropractor, dentist, or attorney; . . . .

(Supp.1990) (Emphasis added).

. . . Since there is no proof in the record that Dr. Hankins is presently a "practicing psychologist," we agree that Hankins is not a witness exempt from subpoena to trial under Tenn. Code Ann. § 24-9-101.

The remaining issue is whether Hankins was unavailable because the plaintiff had been unable to procure his attendance by subpoena. The record shows that at the time of the defendant's objection to the introduction of Hankins' deposition, plaintiff's counsel represented to the court that Hankins was under subpoena to this trial, but that Hankins had advised him that he had been subpoenaed earlier to another trial in Crossville on the same day and therefore could not attend this trial. The trial judge asked plaintiff's counsel to file an affidavit in support of his statement, which was not filed at that time but was later filed as a supplement to the appellate record. The affidavit does not address the question of whether Hankins was subpoenaed for this trial, nor does Hankins' deposition establish that he was subpoenaed for either trial. Accordingly, we find the record is insufficient to show that the plaintiff was "unable to procure the attendance" of Hankins by subpoena, and since plaintiff otherwise failed to prove that Hankins was "unavailable" as contemplated by Tenn. R. Civ. P. 32.01(3), we agree with the defendant that Hankins' deposition was inadmissible as proof of the extent of vocational disability.

814 S.W.2d 346, 351-52 (Tenn. 1991). *Raines* stands for the proposition that the mere assertion by counsel that a witness is unavailable is generally insufficient to prove unavailability. *See also Wilkes*, 2002 WL 31305202 at *1 (observing that "the trial court agreed that representation by [defendant's] counsel was insufficient to prove that Ms. Jackson was out of state").

In *Wilkes*, it was undisputed that a witness lived in California at the time she was deposed, and we held it was not an abuse of discretion to find the witness unavailable under the circumstances, stating:

> The parties do not dispute that when the deposition was taken in September of 2000, six months prior to trial, Ms. Jackson had been a resident of California for two years. In the absence of any offer of proof or suggestion to the contrary, we do not believe that it was an abuse of discretion for the trial judge to determine that Ms. Jackson remained a resident of California at the time of trial, just six months later, or to presume that she in fact was where she resided. The record supports a finding that Ms. Jackson was unavailable at the time of trial.

*Id.* at *6; *see also DePasquale v. Chamberlain*, 282 S.W.3d 47, 56 (Tenn. Ct. App. 2008) (affirming unavailability finding where witness was deposed in Chattanooga, but undisputedly had moved to San Diego by time of trial).

Bilbrey argues that the proper procedure for establishing the unavailability of a witness was described in *Johnson v. McCommon*, No. 02A01-9502-CV-00029, 1996 WL 243985 at *1 (Tenn. Ct. App. W.S., filed May 9, 1996), as follows:

> *Prior to trial*, defendant filed an affidavit with the trial court stating that Harris resided in Mississippi and that defendant would be unable to procure Harris' presence by subpoena because there was no known Tennessee address to which defendant could issue a subpoena. The trial court agreed to admit the deposition on the condition that the parties attempt to locate the witness and report the results of such attempt to the court. The parties confirmed to the court that Harris still resided out of state.

(Emphasis added.) We agree that it would have been better practice to have followed this procedure. However, the trial court should not be faulted for Parks' failure to timely notify

the court and the opposing party prior to trial of her intention to use Culver's deposition under the unavailability rule.

Nevertheless, the admission of Culver's deposition is troubling, for several reasons. First, as Bilbrey argues, the statements suggesting that Culver had moved from Cumberland County are inadmissible hearsay, and possibly multiple levels of hearsay. Second, the statements of the current tenant in the house where Culver resided at the time of his deposition, and of the landlord, arguably establish little more than the fact that Culver had changed his residence – not that he had moved out of Cumberland County, or was more than 100 miles from Crossville at the time of trial. In this regard, we note that, unlike in **DePasquale** and particularly in **Wilkes**, where the California residence of the unavailable witness was undisputed, Culver's residence was unknown, unproven, and in dispute. Third, and perhaps most significant, Bilbrey has a legitimate claim of unfair surprise at Parks' unforeseeable use of the deposition at trial. Bilbrey states in her brief that,

> [i]n reliance on the seven day deadline [of Local Rule 19.04], Bilbrey['s] counsel waited until six days before trial and traveled from Nashville to Crossville to inspect the court file and make a list of the subpoenaed. Culver was not subpoenaed. Bilbrey['s] counsel tailored the Bilbrey case based upon Culver either being called in the Parks' case-in-chief, or not at all, with no chance of his deposition being read.

Bilbrey, like all litigants, had the right to rely on the local rules and the Rules of Civil Procedure and Evidence, and to prepare her case accordingly. Her counsel prepared her case for trial rightly thinking that Culver's deposition would not be entered into evidence. As noted, Parks admits that Culver's subpoena was issued in violation of Local Rule 19.04.

In this case, however, our review of the record persuades us that the issue is largely academic, because even assuming, without deciding, that it was error to admit the deposition, such error was not prejudicial. "When evidence is improperly admitted by the trial court, reversal is only called for if the error affected the results of the trial – '[w]hether it is sufficiently prejudicial to require reversal depends on the substance of the evidence, its relation to the other evidence, and the peculiar facts and circumstances of the case.' " **In re Estate of Smallman**, 398 S.W.3d 134, 152 (Tenn. 2013) (quoting **Keith v. Murfreesboro Livestock Mkt., Inc.**, 780 S.W.2d 751, 758 (Tenn. Ct. App. 1989)); *see* Tenn. R. App. P. 36(b) ("[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process.").

In *Estate of Smallman*, the Supreme Court provided comprehensive guidance to Tennessee courts in analyzing alleged error in a jury trial, stating:

> In conducting a harmless error analysis in a jury case, it is incumbent upon the reviewing court to carefully examine the whole record in determining whether admission of the evidence more probably than not influenced the jury's verdict. The reviewing court should consider the substance of the wrongly admitted evidence and its relation to other evidence in the case in the context of the case's peculiar facts and circumstances. *Blankenship v. State*, 219 Tenn. 355, 410 S.W.2d 159, 161 (1966). While it should not be presumed that the jury members were influenced by passion and prejudice as a result of the inadmissible evidence, "it is presumed that the jury considered whatever evidence was laid before them." *Hager v. Hager*, 17 Tenn. App. 143, 66 S.W.2d 250, 257 (1933). In assessing the amount of weight a juror probably would have placed on the erroneously admitted evidence, the reviewing court should take into account whether the facts present a close case or whether the point at issue is not clearly established by the proof. *Id.* A finding of either supports the conclusion that introduction of the evidence was harmful error. *Id.* The court should also bear in mind that the mere fact that there is sufficient evidence in the record to support the jury's verdict does not necessarily render the admission of wrongfully admitted evidence harmless as it cannot be known what weight the jury assigned to the inadmissible evidence in reaching its verdict. *Blankenship*, 410 S.W.2d at 161. If the reviewing court determines, however, that the fact the inadmissible evidence was submitted to establish is clearly established by other evidence in the case that is competent and properly admitted, the court ordinarily should hold the error harmless. *Love v. Smith*, 566 S.W.2d 876, 879 (Tenn. 1978). Further, the reviewing court should examine the degree to which the wrongly admitted evidence was emphasized by its proponent during trial as an indicator of its likely prominence in the minds of the jurors, noting in this regard whether the evidence was mentioned by counsel in opening statement or closing argument. *Cf. State v. Young*, 196 S.W.3d 85, 107 (Tenn. 2006). The reviewing court should not focus on whether other evidence supported the jury's verdict and whether

the jury reached a correct result. Rather, implementing the considerations we have here described and any other appropriate considerations indicated by the specific facts of a case, the court should determine whether the improperly admitted evidence more probably than not prejudiced the jury in its verdict and thereby unfairly tainted the decision-making process.

*Id.* at 152-53 (footnote omitted).

With these standards in mind, we review the evidence presented to the jury. In this case, the testimony of the three people in the Bilbrey car – Bilbrey, Naser, and Culver – was presented. All three gave their perspective of what happened before the accident. Amber Bilbrey testified in pertinent part as follows:

> Q. You were proceeding toward Monterey?
>
> A. Yes.
>
> Q. What was the first thing you noticed when you started to have trouble?
>
> A. Like when I started –
>
> Q. I mean, did you notice that something was going wrong with the car?
>
> A. Yes. It started acting like it was going to – or sort of like missing. It never died but it was just, kind of – you know how it sounds if you're going to run out of gas or something.
>
> Q. And what did you do at that point?
>
> A. At that point, we were pretty much at that trailer and we pulled in and I backed out and headed back towards Mayland. I told Charity I was going to turn around and try to make it back to the store 'cause I thought we were running out of gas.
>
> Q. Okay. And what did – in any event, what – did the car stall out at that time?

-11-

A. Not at that time, no.

Q. Okay. Did you get it turned around?

A. Yes.

Q. Did you start heading back?

A. Yes.

Q. Okay. And at that point, you'd agree there's some driveways around and some side roads and things like that?

A. Yes.

Q. Have you counted them?

A. No, sir.

Q. Okay. What happened next?

A. We kept going towards Mayland way. And right before we got close to the Cove Market, not exactly to the Cove Market, that's when it first died on me.

Q. Okay. And what happened then?

A. They got out, proceeded to push the car, and right as we got about to the middle of the Cove Market, it caught again. So, that's where I kept driving. They told me to just keep on going, there wasn't gas there, so I kept going.

Q. Let me just make – let me just stop you there. Was the Cove Market open, closed –

A. No, it was out of business.

Q. Okay. Was there somebody there?

A. There was someone there.

-12-

Q. What were they doing?

A. He was in the parking lot doing something with the, you know, like the round things in the ground. I'm assuming it has to do with gas, but they weren't open and they were – I think somebody had sold it, and – but the gas wasn't working, but that's what he was doing.

Q. Okay. And there's a real estate office, whatever, there's another –

A. Yes.

Q. – place next –

A. Like right beside it.

Q. Why didn't you pull in there?

A. Because my car was still running at that time.

Q. All right. And – well, it sounds like you were going to leave these folks behind?

A. They told me to keep going. I was trying to get to the gas station, so. Or at least get close to it, so.

Q. And what was your intent? What were you planning to do?

*     *     *

A. I was going to get gas.

Q. All right. Okay. There was some questioning about pushing the car all the way up to the Mayland Market. Is that what you were trying to do?

A. No.

Q. Why not?

-13-

A. 'Cause there's no way we could have pushed that car all the way to Mayland Market.

Q. Do you know how far it is?

A. No, but it's a good ways from where we were at.

Q. Okay. And at the time – before the car came to this final rest position, and we may show you some pictures here in a few minutes, who was pushing?

A. At that time, Charity and Kyle.

Q. All right.  And what were you doing?

A. I was in the driver's seat.

*     *     *

Q. Okay. And why didn't you push it into some  driveway or spot off the road where you, you know, could be further off the road?

A. Because at the time, my car was still running, and if it's running, I'm not going to stop and pull into somebody's driveway.

Q. Fair, fair – fair answer, but I meant after it died.

A. Oh, after it died?  There was only the one driveway that I passed up after it . . . died.

Q. Okay.  And were you still trying to get it started?

A. Yes.  We thought we would be able to get it started, so we pushed it and then we got it to where we got it and –

Q. Okay. Why couldn't you push it anymore?

-14-

A. Because that's where the road starts to incline and there's no way they'd been able to push it.

Charity Naser testified at trial, in pertinent part, as follows:

Q. Okay. Why don't you just tell the jury what happened that night. Start from the turnaround, okay? You're driving down the road, Amber realizes, Oh, my goodness, we're going to run out of gas. Start there. Tell us what happened.

A. Amber told me we were about to run out of gas. Said she was going to turn around in someone's driveway. We turned around in a –

Q. How –

A. – driveway –

Q. – how did Amber – when she said that, what, what, to your observation, caused her to say, We're about to run out of gas?

A. Because the car started to sputter.

Q. Okay. Please continue.

A. The car started to sputter. She said we were running out of gas. We turned around.

* * *

A. She drove up the road.

Q. Okay.

A. Started sputtering. We were, me and Kyle were going to get out and push. The car's still driving, she's still driving the car.

Q. Okay.

A. It's still rolling, still sputtering.

-15-

Q. I would – would you call it catching and missing?

A. Yes.

Q. Okay. Are you to the Cove Market, yet?

A. Yes.

Q. Okay. So, at the Cove Market, what's the status of the car? Running or not running?

A. The car's running past Cove Market. I holler over, Do you have any gas. The gentleman said, No. Told Amber, Go on, go on, they don't have no gas.

Q. Now, where are you relative to the car?

A. I'm behind the car running after the car.

Q. Okay. Where's Kyle?

A. He's behind the car running.

Q. And so, you're hollering up to Amber, Keep going –

A. Keep going, keep going.

Q. – he ain't got no gas? Okay.

A. Because I wanted her to go on to get to the gas station and she could get gas.

Q. Does hope spring eternal you're going to make it?

A. I was hoping that it would go.

Q. At what point did you make the statement, Let me get in there and give it a try, let me in that driver's seat?

A. Right after we had passed Cove Market, we were starting to – where the, the, that driveway is, just right just past the driveway. I thought that if I would get in the vehicle that I could start it and we would continue going.

Q. When you got in that vehicle, did you just grind that starter with that key pushed all the way over until that starter wouldn't turn that engine over anymore?

A. No.

Q. Please continue.

A. No. I turned it over, and it wouldn't start, and I told Amber, I think we're completely out of gas. Tried it again, and I told her, We're not going to run the starter out because I know better than to continue turning a starter.

Q. Okay.

A. So, I told her we were going to push. I was on the driver's side pushing with the door open.

Q. When you – now, are you past the Cove Market?

A. We are past the Cove Market. We are at the destination where we pretty much had the accident because we were unable to push the car when we got out.

Q. You're unable to push a car uphill?

A. Yes.

\* \* \*

Q. Okay. When you give up, where is the car relative to the roadway?

-17-

A. We had pushed it over into the grass area where Amber was pushing as far as I could push without pushing her over the embankment.

Q. Are all four tires still on asphalt?

A. No.

Q. How many tires are off the asphalt?

A. Two.

Q. Driver's side or passenger's side?

A. Passenger's side.

\*  \*  \*

Q. Mrs. Naser, the truth is that to get it to where y'all got it, y'all were –  that car repeatedly stalled out, you tried to start, and y'all would push it, it would start for a little bit, it'd conk out, you'd get out, you'd push, in fact, you testified to that, as well, that you were driving, getting out, pushing, driving, getting out, pushing, on page 31, line, 25, right?

A. Correct.

Q. And that you didn't, you couldn't recall how many times you did it?

A. Correct.

Q. So, it was a good many times that y'all were trying to start that car and get it up that road?

A. Correct.

\*  \*  \*

Q. Okay. But you kept pushing it? In fact, y'all were going to try to push it all the way to Mayland, right?

A. No.

Q. But y'all thought you were going to get it to Mayland, didn't you?

A. Yes.

* * *

Q. Previously, I was asking you about the intent to get the car all the way to Mayland. And the bottom line is, is that y'all continued to push the car even though there were numerous spots to pull the car off and park it, right? You continued pushing the car down the road?

A. Incorrect.

Q. Okay. You continued going down the road even though you had numerous spots to pull off; is that right?

A. Correct.

Q. Okay. Now, once you got the car as far as it would go, you testified that it was completely dead; in other words, it wouldn't, it wouldn't start at all, right?

A. Correct.

Kyle Culver testified in his deposition, in pertinent part, as follows:

Q. So, y'all went to Mayland Market, you bought ice, and then what did you all – when you left Mayland Market where did you go after that?

A. We started heading towards Eddie's house, but we ran out of gas. . . . We turned around in a driveway and tried to make it

-19-

back to Mayland, but we ran out before we could get back to Mayland.

Q. About how far did you all get before y'all started, and I'm using the word before, the engine started stalling?

A. It was over there by the golf course on Highway 70.

Q. Do you know how many miles, roughly, that is?

A. Probably, I'd say, about five or six.

Q. And that's headed in a westbound direction, you all were headed in a westbound direction toward Eddie's house?

A. Yes.

Q. And when you all left Mayland Market, Amber was still driving?

A. Yes, she was.

*     *     *

Q. When you all stopped to turn around in the driveway, did the engine completely stall at that point?

A. Yes, it did.

Q. And once it stalled, did Amber get out to see – who got in to try to get it turned around?

A. Charity did.

Q. Was she able to get it restarted?

A. Yes, she was.

Q. Did y'all have to push it at all at that point?

A. Not at that point, no.

Q. All right. So, once you all got it restarted in the driveway, you started heading back eastbound on 70?

A. Yes, back towards Mayland Market.

Q. And how far did you get before it stalled again?

A. I'd say, probably, a mile, mile and a half.

Q. Okay. At this point, what did you all do when it stalled a mile, a mile and a half going back?

A. That's when me and Charity got out and started pushing it.

Q. Okay. And how far did you all push it?

A. I don't know. Probably about a quarter of mile, half mile 'til we couldn't push it no more.

Q. Where was Amber when the two of you were pushing?

A. She was in the driver's seat.

Q. While you all pushed it this quarter of a, quarter to half mile, did you pass any places where you could have pushed it off the road into a driveway or an asphalt --

A. Yes, we did.

Q. Why didn't you all push it in and just leave it?

A. Because we was going to see if we could get it to Mayland.

Q. Did the vehicle restart?

A. No.

Q. So, y'all were going to try to push it all the way to Mayland?

A. Yes.

*     *     *

Q. Did you, did you get as far as Cove Market?

A. Yes, we did.

Q. Did you talk to anybody at Cove Market, see anybody at Cove Market?

A. Yes. We asked them if their gas pumps were working, and they told us no, not yet.

*     *     *

Q. All right. So, you're at the Cove Market, you've talked to this person that says there's no gas, what did you all do next?

A. We continued pushing the car just a little bit further.

Q. And it still isn't running, it's dead?

A. Yes.

Q. You're pushing it a little bit further? You, were you hoping to just keep pushing it all the way to Mayland?

A. Yes. That's what we was going to do – yes, that's what we was going to try to do.

Q. Were you all going – we're y'all going to, kind of, swap out or was it up to you to try to push it, push that thing?

A. I was pushing it.

Q. Was Charity helping you intermittently?

A. Yes, she was.

-22-

Q. Did she rotate out with Amber to –

A. No, Amber was the steerer or the driver.

Q: . . . All right. So, you pushed it a little further. Can you estimate how much further you pushed it?

A. Probably a quarter of a mile.

Q. From the Cove Market?

A. Yes.

Q. What made you stop?

A. We got wore out.

Q. Once you got wore out – once you were worn out, what did you do?

A. Pushed it off the road as far as we could, told Amber to turn on – well, the hazards were already on, and a truck stopped and picked me and Charity up.

Q. And when you're talking about pushed it off the road, Kyle, specifically how far off the road were you able to get it?  Were there any, the – if you were sitting in the driver's seat?

A. Yes.

Q. On the left side of the vehicle, were any of the tires over on the other side of the white line on the driver's side?

A. Yes, they were.

Q. About how far?

A. Far enough if we would have went any further we would have been in the ditch.

-23-

Q. Okay. Now, I'm talking the right-side tires, I'm sorry. I'm talking about the, excuse me, I'm talking about the left-side tires.

A. Yes.

Q. They were over onto the ditch, the left side of the white line on the side of the road, right? Is that –

A. We was heading back towards Mayland, so the right side was off the road and the left side was still half on the road.

Q. And it was about half on the road?

A. About like half, quarter, half, yes.

Q. The right side, those tires were off the road, were right off the road?

A. Off the road.

As can be seen from the preceding excerpts, Culver's deposition testimony is almost entirely consistent with, and cumulative to, that of Bilbrey and Naser. In her brief, Bilbrey argues that the admission of Culver's testimony was prejudicial in the following ways:

Chasity Na[se]r and Amber Bilbrey's testimonies v[a]ry slightly on the semantics of turning around and subsequently how often the car was running versus being pushed.

Kyle Culver's deposition testimony, in stark contrast, is replete with juvenile, male ego of having pushed a mul[t]i-thousands of pounds car for a half mile to get back to the Cove Market and then another quarter of a mile past the Cove Market. Mr. Culver claims to have planned on pushing the car all the way back to Mayland. Culver's testimony was an absolute contradiction to the testimony of Charity Nas[e]r and Amber Bilbrey. Culver's testimony paints a picture of foolishly pushing a non[] operational car for 3/4 of a mile, total, instead of pushing it as far off the road as possible at the point it stopped running. Further[,] Culver's testimony puts the final rest of the car and

-24-

the area of impact a quarter-mile (1320 feet) past the Cove Market, not 700 feet. "Moving" the area of impact makes an enormous difference. Because the area of impact testified to by Bilbrey and Nas[e]r was a long, flat, straight, stretch of two-lane road with a small shoulder and then a drop-off into a ditch. A quarter mile past the Cove Market provides more places the car could have been pushed off the road and the road started winding again.

(Citations to the record omitted.)

The minor discrepancies in Culver's testimony that Bilbrey attempts to highlight are not actually even in conflict with the other testimony heard by the jury. Culver's intentions as to how far he was *hoping* to push the car – *i.e.*, whether he thought they could push it all the way back to the Mayland Market – are irrelevant. The location of the accident is not in dispute. Sgt. Roark took pictures of marks in the road at the precise spot the cars collided. Thus, Culver's *estimation* of how far they pushed the car past the Cove Market does not change where it happened. The picture painted by Culver's deposition testimony closely matches the pictures presented by the other two witnesses,[1] and any discrepancies are not pertinent to the fundamental issues of Bilbrey's negligence and comparative fault. We hold that any error in admitting Culver's deposition testimony did not affect the judgment or jury verdict and consequently was harmless.

B.

We now turn to the testimony of Sgt. Roark regarding a cell phone voice message that he listened to shortly after the accident. The testimony at issue, proffered by Parks and objected to by Bilbrey, is as follows:

> Q: At the time of the accident, what recording, if at all, or what statement did you hear from . . . Ms. Amber Bilbrey?
>
> A: I listened to a phone message . . .

*     *     *

---

[1] We further note that in some instances, Culver's testimony is actually more helpful to Bilbrey's case than her own testimony. For example, Culver arguably presented a picture of a more well-lighted and visible accident scene than Bilbrey's testimony.

Q: And, Trooper Roark, at that time, when you heard that particular message, were you able to later talk to the driver of the '96 Cavalier, Ms. Bilbrey?

A: I, I talked to her after that period of time. I don't believe it was on scene, but I spoke to her.

Q: All right. And at the time you talked to her and based on the message that you heard that night, how would you describe the two voices?

A: They sounded the same. They was similar. The one on the phone seemed to be more excited than the normal talking but it appeared to be the same person. . . . I spoke to Ms. Bilbrey in the hall just the other day, just telling her she looked excited and try to calm down, just to be nice.

Q: And you were able –

A: So, I, I do recognize the voice.

* * *

Q: All right. With that foundation laid, Sergeant Roark, if you will, please, what did you hear that night of the accident?

A: I heard a lady's voice saying, Where the "F" are you all, I'm getting scared, and she either said, the lights are going down, or, the lights have went out. I don't recall which, which she said. She may have said they're getting low. I'm not exactly sure, but she said something about the lights and I'm going to get out of the vehicle.

The voice message was from Bilbrey to Culver. Sgt. Roark listened to it on Bilbrey's cell phone shortly after the accident. Bilbrey did not deny sending it, but disputed that she said anything about the emergency flashers. Culver testified that shortly after the accident, "the police officer picked it [a cell phone] up and said, I found a phone, and I said, that's my girlfriend's." Sgt. Roark testified that Culver told him that the voice message was from Bilbrey. This statement drew a hearsay objection, and Parks' counsel agreed that the statement was hearsay. Parks argued that Sgt. Roark's testimony about the voice message

-26-

was admissible because Sgt. Roark was able and competent to independently identify the voice as Bilbrey's.

Bilbrey objected on the grounds that Parks did not present the best evidence of the voice message – the recording itself – citing Tenn. R. Evid. 1002, which provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules[.]" Parks pointed to the testimony of Bilbrey and Culver that the cell phones they used at the time of the accident had since been lost or destroyed. Parks relied on Tenn. R. Evid. 1004, which states that "[t]he original is not required, and other evidence of a writing, recording, or photograph is admissible if – (1) . . . All originals are lost or destroyed, unless the proponent lost or destroyed them in bad faith[.]" The trial court allowed the testimony, ruling as follows:

> It appears to me that based upon the proof we've heard thus far that the original audio file is unavailable and under those circumstances, Rule 1004 allows for oral testimony about the content of that in circumstances where it's unavailable, or lost, or destroyed. [I]t further appears that this would come in as an admission by a party opponent.

The court's ruling that the audio file was lost or destroyed is supported by the evidence and well within the trial court's broad discretion concerning evidentiary matters.

Bilbrey argues that Sgt. Roark was not competent to identify Bilbrey's voice as the one on the recording, because he never heard her speak before the accident and did not establish sufficient familiarity with her voice to identify it. Tenn. R. Evid. 901 governs this issue and provides in pertinent part:

> (a) . . . The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims.
>
> (b) . . . By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

*       *       *

-27-

(5) *Voice Identification*. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice *at any time* under circumstances connecting it with the alleged speaker.

(Emphasis provided.) Sgt. Roark heard Bilbrey's voice after the accident and testified that he recognized it as the one on the voice message. The trial court did not err in admitting the testimony under Rule 901.

Finally, Bilbrey argues the voice message was inadmissible hearsay because it does not qualify as a party-opponent admission under Tenn. R. Evid. 803(1.2), which provides in pertinent part that "[t]he following are not excluded by the hearsay rule: . . . A statement offered against a party that is (A) the party's own statement in either an individual or a representative capacity[.]" Bilbrey asserts that "in order to qualify under this exception, the statement 'must be against the declarant's interest when made,' " quoting ***Dailey v. Bateman***, 937 S.W.2d 927, 930 (Tenn. Ct. App. 1996). This argument reflects a misconception that the Supreme Court dispelled in 2007, stating:

> Rule 803(1.2) provides that "[a] statement offered against a party that is . . . the party's own statement in either an individual or a representative capacity" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(1.2) (2006). Although the Court of Criminal Appeals classified the statement as "an admission against interest," the rule does not require that a statement be against interest as a condition for admissibility:
>
>> Contrary to some common misconceptions, it does not matter that the statement was self-serving when made but turns out to be harmful by the time of trial. Accordingly, the misleading term, "admission against interest," should be banned from . . . appellate opinions. Under Rule 803(1.2)(A), it does not matter whether the declaration was self-serving when made. . . . If the opponent wants to use it, the statement comes in as evidence.
>
> Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.06[3][a] at 8–47 to 8–48 (5th ed. 2005). "Anything the opposing party said or wrote out of court is admissible in court against that party.

> Whether the statement was disserving or self-serving when made is immaterial." Donald F. Paine, *Paine on Procedure: Admissions 'against interest'*, 43 Tenn. B.J. 32 (April 2007). In summary, a statement need not be against interest when made by a party opponent to qualify for admission under Rule 803(1.2).

*State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007). The trial court correctly ruled that Sgt. Roark's testimony should not be excluded by the hearsay rule.

V.

The trial court's judgment is affirmed. Costs on appeal are assessed to the appellant, Amber Bilbrey. This case is remanded to the trial court, pursuant to applicable law, for collection of costs below.

_____<br>
CHARLES D. SUSANO, JR., CHIEF JUDGE